OPINION
{¶ 1} Appellant, Ronald Lynn Shaffer, appeals from the March 6, 2001 judgment entry of the Trumbull County Court of Common Pleas, in which he was sentenced for aggravated murder, attempted aggravated murder, kidnapping, aggravated burglary, and aggravated robbery.
 {¶ 2} On July 5, 2000, appellant was indicted by the Trumbull County Grand Jury ("grand jury") on two counts of aggravated murder with aggravating circumstances and firearm specifications, in violation of R.C. 2903.01(B), R.C. 2929.04(A)(5) and (7), R.C. 2941.14(C), and 2941.145; one count of attempted aggravated murder with a firearm specification, a felony of the first degree, in violation of R.C. 2923.02, 2903.01(B), and2941.145; two counts of kidnapping with firearm specifications, felonies of the first degree, in violation of R.C. 2905.01(A)(2) and 2941.145; one count of aggravated burglary with a firearm specification, a felony of the first degree, in violation of R.C. 2911.11(A)(1) and/or (2), and2941.145; and aggravated robbery with a firearm specification, a felony of the first degree, in violation of R.C. 2911.01(A)(1) and/or (3), and R.C. 2941.145. On August 28, 2000, the grand jury issued a superseding indictment, adding a prior calculation and design element to the first two counts.
 {¶ 3} Appellant entered not guilty pleas at his arraignments on July 5, 2000, and again on August 31, 2000. On July 20, 2000, appellant filed numerous motions, including a motion to suppress fruits of an unconstitutional arrest, a motion to suppress all oral, written, and/or videotaped statements given to police, and a constitutional motion to dismiss. On July 21, 2000, appellant filed a motion to determine competency, and a hearing was held on September 6, 2000. Pursuant to the trial court's September 15, 2000 judgment entry, appellant was found competent to stand trial. Hearings on appellant's motion to suppress were held on September 29, 2000, and again on November 20, 2000. On January 5, 2001, the trial court overruled appellant's July 20, 2000 motions. The matter proceeded to a jury trial, which commenced on February 14, 2001. The trial court sustained appellant's motion at the close of the evidence to dismiss the element as to counts one and two regarding prior calculation and design. On February 28, 2001, the jury returned a verdict of guilty on all counts and remaining specifications.
 {¶ 4} The facts emanating from the record are as follows: on June 23, 2000, several individuals gathered at the home of David Harper ("Harper"), located at 4520 Prospect Street in Newton Falls, Ohio, Trumbull County. Harper was home along with fellow co-worker John Lago ("Lago") and friends, Garry Bell ("Bell") and Jennifer Atkinson ("Atkinson"). Atkinson was waiting for her eighteen-month-old son, Dillon, to be dropped off by his paternal grandparents, Charles Mathey ("Charles") and Karen Mathey ("Karen"), who picked up Dillon from their son's, Jason Mathey's, apartment. Charles and Karen arrived at Harper's home with Dillon around 9:00 p.m.
 {¶ 5} According to Karen's testimony, after Harper invited them inside, she noticed Harper and Bell were smoking marijuana. Karen and Harper then went outside on the front porch to talk about some personal issues. While outside, both Karen and Harper saw two individuals approaching Harper's house, clad with what appeared to be nylon stockings over their faces and armed with large guns. Karen was able to discern that both individuals were men by their voices. Harper was also able to determine that both individuals were male and that one was black from the sound of his voice. Harper testified that the black man asked how many people were inside the house, to which Karen replied, "[t]hree or four." Both men then pointed their guns in Karen's and Harper's faces and ordered them into the house.
 {¶ 6} According to Harper, when they went inside his house, he yelled to the others, "[w]e're being robbed. Get out." Karen, along with Jennifer and Dillon, quickly went upstairs. Lago testified that he saw two armed men dressed in black clothing with either ski masks or stockings over their heads enter Harper's residence, so he escaped through a rear sliding glass door. Lago hid in some weeds on the other side of Harper's neighbor's house and heard gunshots coming from inside. Both Karen and Jennifer also heard a number of gunshots. Jennifer stated that she heard Harper yell to one of his dogs, "[g]et him Dottie."
 {¶ 7} Harper testified that the man with the shotgun shot him in the leg after the other intruder shot him in the back of the head. While lying on the floor floating in and out of consciousness, Harper recalled that one of the gunmen shot him again. Harper could not state which of the armed men had shot him on either occasion. Harper said that he had seen appellant at least twice about two weeks or a month prior to the shootings and that he was able to identify him as one of the assailants. During the trial, Harper was unable to identify appellant in court, stating that it had been awhile since he last saw him. Harper further testified that there was marijuana in his house.
 {¶ 8} After the shooting ended, Karen went downstairs to check on Charles. Karen first discovered Bell sitting on the floor, wounded and half-breathing. Charles was unresponsive, lying face down, half inside of the house and half outside of the shattered sliding glass door. Karen then called 9-1-1. Lago, who was still outside at this time, stated that because he saw someone lying through the sliding glass door, which is located in the back of Harper's house, he went around to the front and entered through the front door. Lago saw Harper in the bathroom, where he was bleeding profusely, as well as Bell, who was lying face down on the floor. Lago tried to administer first aid to all three victims.
 {¶ 9} Officer Gregory Dubos ("Officer Dubos"), with the Newton Township Police Department, was dispatched to Harper's residence. Officer Dubos arrived at 9:38 p.m. and first talked with Atkinson, who was standing in the front yard with Dillon. According to Officer Dubos, Atkinson was crying uncontrollably, but neither she nor Dillon was hurt. Officer Dubos proceeded inside the house and noticed that Harper was bleeding profusely from his legs. Harper told Officer Dubos that he had been shot in the leg, arm, and head. Officer Dubos then saw Bell in a pool of blood, lying against a wall. Karen was in the kitchen area with Charles, who was lying partially through the sliding glass door. At that time, Officer Dubos noticed two or three green shotgun shells and moved them a couple of feet out of the way with his foot so that no one would step on them. Officer Dubos then called the Trumbull County Sheriff's Department ("Sheriff's Department") for back up.
 {¶ 10} Medical personnel next arrived. Although Harper survived his injuries, Charles and Bell were both pronounced dead that night. Dr. Jesse C. Giles ("Dr. Giles"), a forensic pathologist, performed an autopsy on Bell at St. Elizabeth Health System in Youngstown, Ohio. Dr. Giles stated that the cause of Bell's death was multiple firearm injuries to his trunk, which led to multiple organ injuries that caused Bell to bleed to death. Dr. Lisa Kohler ("Dr. Kohler"), Acting Chief Medical Examiner for the Summit County Medical Examiner's Office, performed an autopsy on Charles. Dr. Kohler discovered that Charles sustained a single shotgun blast to his back and shoulder. Dr. Kohler determined that Charles died from multiple injuries, including perforations to his lungs and major arteries, causing excessive bleeding.
 {¶ 11} Kenneth Evans ("Evans"), a part-time paramedic with the Newton Falls Fire Department, was dispatched to the scene and later rode in the ambulance with Harper while he was being transported to Trumbull Memorial Hospital in Warren, Ohio. Richard L. Tackett ("Detective Tackett"), a detective with the Sheriff's Department, was also called to Harper's residence to investigate the incident. Detective Tacket testified that he was then dispatched to the Newton Falls Fire Station in order to talk with Evans. According to Detective Tackett, Evans told him that while riding with Harper in the ambulance, Harper conveyed that appellant was one of the perpetrators.
 {¶ 12} After hearing about the shootings, Crystal Sutton ("Crystal"), appellant's brother's fiance, contacted the police because she was concerned about her brother, David Sutton, who lived with Harper. Crystal told officers that appellant was living with his uncle, Dennis Gossett ("Gossett"). On June 24, 2000, around 4:30 a.m., officers from the Sheriff's Department arrived at Gossett's home, located at 1773 Colt Court in Warren, Ohio. Once the officers arrived, both appellant and Gossett voluntarily agreed to speak with them. Officer Gary Bacon ("Captain Bacon") spoke with Gossett, while Peter Lucic ("Lieutenant Lucic") spoke with appellant. Lieutenant Lucic testified that he asked appellant, "would you mind talking to me? You are not under arrest or anything, but I would like to ask you a few questions about where you were this evening." According to Lieutenant Lucic, appellant replied, "[s]ure."
 {¶ 13} Lieutenant Lucic testified that appellant told him that he and Gossett had gone fishing together at Canoe City in Warren, Ohio, and that they had driven there in his vehicle. According to Captain Bacon, Gossett also told him that he and appellant went fishing, but Gossett stated that they rode their bikes. Gossett further said that he and appellant stopped by an unidentified female's house where he engaged in sex with her, however, appellant did not relate this encounter to Lieutenant Lucic.
 {¶ 14} Crystal testified that appellant was at her home in Newton Falls just moments before the shootings. Crystal further stated that she overheard a conversation one week before the shootings in which appellant attempted to involve his brother, Earl Shaffer, in an armed robbery. Also, Elizabeth O'Malley (O'Malley), a friend of appellant's, testified that she invited appellant to a party which began at 9:00 p.m. on June 23, 2000, but appellant did not arrive until after 11:00 p.m. O'Malley stated that appellant drank some beer but "[appellant] wasn't really drunk or anything. * * * He really didn't drink that much."
 {¶ 15} Gossett consented to a search of his home, and appellant consented to a search of his vehicle. One pair of black gloves with the fingers cut off was found in appellant's car. Inside Gossett's home, Lieutenant Lucic found and confiscated two pairs of black combat boots, both of which had fresh mud on the bottoms and one of the pairs had a live worm on the bottom, black battle dress uniform ("BDU") pants with a brown belt, a black BDU long sleeve jacket, one pair of green camouflage BDU pants, and a green camouflage BDU long sleeve jacket. According to Lieutenant Lucic, Gossett stated that he owned the green camouflage outfit, but did not know who owned the black BDU outfit. In the basement of Gossett's home, Captain Bacon discovered a Mossburg shotgun box, which was open and empty, except for the gun's long stock and three empty Remington Number One buck shotgun shell boxes.
 {¶ 16} On June 24, 2000, at 4:57 a.m., Lieutenant Lucic again advised appellant that he was not under arrest but would like for them to talk a little bit more at the Sheriff's Department. Lieutenant Lucic then read appellant his Miranda rights. Appellant voluntarily signed a waiver of rights form and agreed to accompany Lieutenant Lucic in the back of his cruiser to the station.
 {¶ 17} At the station, Lieutenant Lucic again advised appellant that he was not under arrest. At 6:00 a.m., appellant signed his second waiver of rights form. Lieutenant Lucic questioned appellant about the shootings which occurred at the Harper residence. According to Lieutenant Lucic, appellant claimed that he did not know anything except that an unidentified person from Newton Falls called and told him that three people had been killed. Lieutenant Lucic stated to appellant that he had recovered an empty twelve-gauge Mossburg shotgun box at the Gossett residence and ammunition for an SKS rifle. Lieutenant Lucic also pointed out that officers had recovered spent twelve-gauge shotgun shells at the crime scene. Lieutenant Lucic then asked appellant if his fingerprints would be on any of those ejected shells. Lieutenant Lucic testified that appellant "was quiet for a little bit, put his head down, and you could see his eyes start tearing up, and I asked him, I said, `[y]ou are sorry for what you did, aren't you?' And [appellant] said, `I feel really bad about doing this,' and [appellant] started crying. I then asked him to promise me, promise me, you will never do anything like this ever again, and [appellant] said that he wouldn't."
 {¶ 18} According to Lieutenant Lucic, appellant then began to talk about his dysfunctional childhood and how he had been in and out of detention centers, as well as how he had always felt that no one loved him. Lieutenant Lucic testified that appellant admitted to breaking into Harper's home several weeks prior to the shootings in which he had stolen six pounds of marijuana. Lieutenant Lucic stated that when he further discussed the shootings with appellant, "[appellant] said that he was involved and that it was his idea, that [Gossett] wasn't involved. And I had asked [appellant] if he would agree to provide me with a tape recorded statement and [appellant] said that he would only give it to me, and [appellant] said, `[y]ou better get your tape recorder ready, because I'm only going to say it once."
 {¶ 19} On June 24, 2000, at 8:15 a.m., after Lieutenant Lucic advised appellant of his rights again, appellant signed his third waiver of rights form, which did not contain language that he was not under arrest like the previous two. According to Lieutenant Lucic, appellant asked him, "[w]hat if I just got up and left right now?" Lieutenant Lucic replied to appellant that based on his admissions of the break-in and homicides, he was not free to leave. At that time, Lieutenant Lucic took a tape-recorded statement from appellant.
 {¶ 20} According to the audio tape, appellant acknowledged carrying the Mossburg shotgun and retrofitting it with a pistol grip which came free with the gun. Appellant declined to answer any questions regarding the earlier break-in of Harper's residence. Appellant stated that he knew Harper, had been to his home on previous occasions, and specifically said that he was going there for "weed and money." Appellant told Lieutenant Lucic on the audio tape that he and his co-defendant, Eric Porterfield ("Porterfield"), were dressed in "black SWAT team uniforms." Appellant stated that he wore two black stockings over his face, and Porterfield wore a black winter mask during the shootings.
 {¶ 21} Pursuant to the tape-recorded interview, appellant acknowledged that Harper and a lady were on the front porch when they arrived. Appellant said that when Porterfield was not looking, he "pushed" the lady upstairs and "let" one "dude" run out the back door. Appellant stated that Harper came after Porterfield, and "they were tussling." Appellant claimed that one of the men started to charge toward him, so he shot him in his left side. Another man ran toward the kitchen utensils, so appellant shot him in the back, which forced him halfway through the sliding glass door. Appellant stated that he then began to hear shots all around, which scared him, so he shot again. Appellant claimed that neither he nor Porterfield had any intentions of shooting anyone, and that he was "terribly" sorry for what had happened. Appellant told Lieutenant Lucic that he could find both weapons, three clips, and two shells in a sewer about three blocks from Colt Court.
 {¶ 22} After the interview, appellant agreed to take officers to the sewer grate at the intersection of Southwest Boulevard and Ferndale in Warren, Ohio, where he hid the weapons, as well as to show them where Porterfield lived. Peter Pizzulo ("Sergeant Pizzulo"), a sergeant with the Sheriff's Office, testified that he recovered from the sewer a Mossburg pump shotgun with a pistol grip, one semi-automatic rifle Durango SKS, two Remington twelve-gauge shotgun shells, one of which contained Number One buckshot, and two live 7.62 cartridges. Based on the information supplied by appellant, Captain Bacon went to Porterfield's house, located at 1752 Colt Court and arrested him.
 {¶ 23} Once the officers returned to the Sheriff's Department with appellant, Lieutenant Lucic orally re-advised appellant of his rights. On June 24, 2000, at approximately 11:25 a.m., appellant consented to give a videotaped statement to Lieutenant Lucic and Captain Bacon, which essentially contained the same information as the earlier audio tape. However, on the videotape, appellant acknowledged that he went to Harper's residence with eight shells loaded in his shotgun and left with two, did not take anything from the house, stashed his black SWAT team outfit in Gossett's closet, and that the shotgun box found at Gossett's home was the box to his Mossburg.
 {¶ 24} The weapons recovered from the sewer, as well as the shotgun shells and SKS cartridges recovered from Harper's residence, were submitted to the Bureau of Criminal Identification and Investigation ("BCI") for analysis. Richard Turbok ("Turbok"), a firearms examiner with BCI, testified that both the Mossburg shotgun and the SKS rifle were operable. Turbok stated that seven fired cartridges recovered from the scene were fired from the SKS rifle. Turbok could not conclusively state that the six twelve-gauge shells were fired from the Mossburg shotgun, but testified that five of the six shells were extracted from the gun.
 {¶ 25} Pete Leftheris, Jr. ("Leftheris"), owner of Pete's Gun Shack on Parkman Road in Warren, Ohio, testified that appellant was a customer and had been in his store on several occasions. Leftheris stated that appellant came in with Shandra Manista ("Manista") on June 17, 2000, and purchased a Mossburg shotgun, an SKS rifle, and ammunition. Manista testified that appellant asked her to purchase some guns for him and gave her the money before they went into Pete's Gun Shack. Manista's name was used for the F.B.I. background check and her name is listed on the receipt.
 {¶ 26} On March 6, 2001, a sentencing hearing was held. Pursuant to the March 6, 2001 judgment entry, the trial court sentenced appellant to life without parole on counts one and two, aggravated murder, with the terms to be served consecutively; nine years as to count three, attempted aggravated murder, to run consecutively to counts one and two; nine years each for counts four and five, kidnapping, to run concurrently with counts one, two, and three; nine years as to count six, aggravated burglary, to run concurrently to counts one, two, and three; and nine years for count seven, aggravated robbery, to run concurrently to counts one, two, and three. In addition, the trial court ordered appellant to three years actual incarceration to be served prior to and consecutive with any other sentence of confinement as to the firearm specification in count one. The trial court further found that the firearm specifications in counts two, three, four, five, six, and seven, arose out of the same course of conduct and transaction as the firearm specification in count one, and therefore, merged with the firearm specification in count one. Appellant filed a timely notice of appeal on April 3, 2001, and makes the following assignments of error:
 {¶ 27} "[1.] The trial court erred by denying [appellant's] motion to suppress statements made by appellant to police officers.
 {¶ 28} "[2.] The trial court committed plain error by charging the jury as to the definition of `purposefully' as requiring a culpable mental state `at all times in question' rather than `at the time in question.'
 {¶ 29} "[3.] The trial court abused its discretion by providing a confusing and erroneous response to the jury's question regarding the definition of `purpose.'
 {¶ 30} "[4.] [Appellant's] conviction is against the manifest weight of the evidence."
 {¶ 31} In his first assignment of error, appellant argues that the trial court committed reversible error when it failed to grant his motion to suppress statements he allegedly made to police in violation of hisMiranda rights against self-incrimination, as guaranteed by Section 10, Article I of the Ohio Constitution and the Fifth, Sixth, andFourteenth Amendments to the United States Constitution. Appellant alleges that the record reveals that he was in custody at the commencement of the interrogation and was specifically advised otherwise.
 {¶ 32} This court stated in State v. Taylor (Mar. 23, 2001), 11th Dist. No. 99-P-0071, 2001 Ohio App. LEXIS 1393, at 6-7, that "[i]t is well-established law that a police officer must inform a suspect in custody that he has the right to remain silent, that his statements may be used against him in a court of law, that he has the right to an attorney, and that if he cannot afford an attorney, one will be appointed prior to questioning. Miranda v. Arizona (1966), 384 U.S. 436, 444. Thereafter, the suspect may waive those rights and make incriminating statements against himself without the presence of counsel. Id."
 {¶ 33} We further stated in Taylor, supra, at 8-9, quoting Statev. Eley (1996), 77 Ohio St.3d 174, 178, that "* * * the state has the burden of proving by a preponderance of the evidence that a defendant `voluntarily, knowingly, and intelligently' waived his Miranda rights based on the `totality of the circumstances' surrounding the interrogation. In addition, the trial court assumes the role of the trier of fact when considering a motion to suppress and, therefore, is in the best position to resolve factual questions and evaluate the credibility of witnesses. State v. Kobi (1997), 122 Ohio App.3d 160, 167. Such a finding will not be disturbed on appeal absent an abuse of discretion. [State v. Nelson (Sept. 24, 1999), 11th Dist. No. 97-L-108, 1999 Ohio App. LEXIS 4468, at 4.] To determine whether a defendant's confession was involuntary, `the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.' State v. Edwards (1976),49 Ohio St.2d 31, at paragraph two of the syllabus." (Parallel citations omitted.) "* * * [I]n the absence of police coercion, a defendant's youthful age and low I.Q. do not negate an otherwise voluntary confession." State v. Comstock (Aug. 15, 1997), 11th Dist. No. 96-A-0058, 1997 Ohio App. LEXIS 3670, at 11.
 {¶ 34} In State v. Biros (1997), 78 Ohio St.3d 426, 440, quotingBerkemer v. McCarty (1984), 468 U.S. 420, 442, the Supreme Court held: "`[t]he determination whether a custodial interrogation has occurred requires an inquiry into `how a reasonable man in the suspect's position would have understood his situation.'" "Custody encompasses a formal arrest or restraint of movement of the degree associated with a formal arrest." State v. Jett (Mar. 31, 1998), 11th Dist. No. 97-P-0023, 1998 Ohio App. LEXIS 1451, at 16. "The Court has defined `interrogation' to include `any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 16-17, citing Rhode Island v. Innis (1980), 446 U.S. 291, 301.
 {¶ 35} In the case at bar, appellant argues that Stanley Palumbo ("Dr. Palumbo"), a licensed clinical psychologist, examined appellant and testified at the competency hearing that appellant has an I.Q. rank that falls within the bottom seventeen percent. Appellant also has a history of drug use, a family history of mental illness, and according to Dr. Palumbo, was suffering from anti-social personality and possibly depression. Appellant contends that Lieutenant Lucic, in contrast, is a very strong and intimidating man due to the fact that he is a lieutenant, an assistant commander of the Sheriff's Department SWAT team, and a wrestler.
 {¶ 36} Appellant also alleges that it was error for Lieutenant Lucic not to advise him of his rights at the outset of questioning him at Gossett's residence, then later advise him of his rights, using a form which indicated that he was not under arrest. Appellant stresses that because he was at Gossett's home, which is where appellant was presently living, he was not free to leave. Also, appellant notes that it was almost 5:00 a.m., he had been drinking for much of the night, and had not slept since the day before. Therefore, according to appellant, Lieutenant Lucic should not have deemed him to be sober and coherent in order to understand that he was not under arrest.
 {¶ 37} Furthermore, appellant argues that Lieutenant Lucic should not have transported him in the back of his cruiser en route to the station for further questioning. At the station, appellant notes that Lieutenant Lucic again advised him of his rights by using a not under arrest form. Appellant contends that no reasonable person confined in such a manner would have felt free to leave. After admitting to owning the gun box and breaking into Harper's home, Lieutenant Lucic requested to tape record the conversation and again advised appellant of his rights from a form, though this time the form did not state "not under arrest" like the previous two. After appellant signed this rights form, Lieutenant Lucic informed him that he was under arrest, but did not further question him about the burglary, but rather only the shooting incident. Thus, appellant alleges that the restriction of movement and attempts to elicit incriminating responses constitute a custodial interrogation and that he did not voluntarily, knowingly, or intelligently waive his Miranda rights. Therefore, appellant contends that any statements or adoption obtained from him should have been suppressed. We disagree.
 {¶ 38} In the instant matter, the record clearly reflects that Lieutenant Lucic advised appellant of his rights at least three times, and appellant signed three waiver of rights forms within a four-hour time period. Pursuant to Harper's identification of appellant as a possible suspect and Crystal's statement that appellant was planning an armed robbery, Lieutenant Lucic initially approached appellant at Gossett's residence and asked him a general question regarding his whereabouts. However, there was an inconsistency in appellant's and Gossett's statements. Also, there is no evidence in the record which suggests that appellant was intimidated or felt threatened by Lieutenant Lucic. No witness testified at the suppression hearing nor did appellant allude to the fact that he was drunk on the night at issue. In fact, O'Malley testified at trial that she was with appellant during the early morning hours of June 24, 2000, and that appellant did not appear to be drunk. Also, according to Lieutenant Lucic, appellant looked awake, did not seem high or intoxicated, and appeared to understand their preliminary conversation. Furthermore, pursuant to the audio and videotapes, appellant answered questions posed to him by Lieutenant Lucic in a clear, coherent, and logical manner.
 {¶ 39} Because appellant was not placed under arrest, nor was he detained in any manner at Gossett's residence, Lieutenant Lucic made a proper non-custodial inquiry when he asked appellant about his whereabouts. At Gossett's residence, Lieutenant Lucic specifically advised appellant that he was not under arrest, and appellant signed a waiver of rights form indicating that he was not under arrest. Appellant then voluntarily agreed to accompany Lieutenant Lucic to the Sheriff's Department for further questioning. En route to the Sheriff's Department, appellant was not handcuffed nor were the cruiser's lights and siren activated. Therefore, based on the foregoing facts, and pursuant to Biros, supra, a reasonable man in appellant's position would not have perceived that he was under arrest either at Gossett's residence or on the ride to the station.
 {¶ 40} At the Sheriff's Department, appellant signed another waiver of rights form advising him that he was not under arrest. Appellant then voluntarily admitted to breaking into Harper's home, as well as being involved in the shootings. At that time, appellant signed his third waiver of rights form, which did not contain language that he was not under arrest and Lieutenant Lucic told appellant that he was not free to leave. Nevertheless, appellant further confessed and voluntarily agreed to make recorded statements on audio and videotapes.
 {¶ 41} The point of arrest did not occur until appellant voluntarily confessed at the Sheriff's Department on June 24, 2000, at 8:15 a.m. Prior to that time, Miranda warnings were not required, however, they were given as a safeguard. Appellant never requested an attorney or asked that questioning cease. Even when the questioning later rose to the level of a custodial interrogation, appellant voluntarily, knowingly, and intelligently waived his Miranda rights both orally and in writing when he agreed to speak further with Lieutenant Lucic. Pursuant to Comstock, supra, because there was no police coercion, appellant's low I.Q. does not negate his voluntary confession since the record supports the conclusion that appellant did not have any apparent difficulty understanding Lieutenant Lucic's questions or comments, and the narrative he rendered was clear and responsive. Therefore, the trial court did not err by denying appellant's motion to suppress statements. Thus, appellant's first assignment of error is without merit.
 {¶ 42} In his second assignment of error, appellant argues that the trial court committed plain error by charging the jury regarding the definition of "purposefully" as requiring a culpable mental state "at all times in question" rather than "at the time in question." Appellant specifically contends that the prosecution concurred that such a charge was erroneous; additionally, the trial court itself recognized that clarification was necessary. However, appellant argues it never provided a supplemental instruction on this point despite the fact that the jury submitted a question on the foregoing exact language employed by the trial court despite a jury question.
 {¶ 43} State v. Cooperrider (1983), 4 Ohio St.3d 226, 227, states: "[A]n erroneous jury instruction `does not constitute a plain error or defect under Crim.R. 52(B) unless, but for the error, the outcome of the trial clearly would have been otherwise.' State v. Long (1978),53 Ohio St.2d 91, 97 * * *. Additionally, the plain error rule is to be applied with the utmost caution and invoked only under exceptional circumstances, in order to prevent a manifest miscarriage of justice. * * *." (Parallel citations omitted.) "A party cannot take advantage of an error he invited or induced." State v. Seiber (1990), 56 Ohio St.3d 4,17.
 {¶ 44} "The instructions found in Ohio Jury Instructions are not mandatory. Rather, they are recommended instructions based primarily upon case law and statutes, crafted by eminent jurists to assist trial judges with correctly and efficiently charging the jury as to the law applicable to a particular case. Requiring a trial court to rigidly follow these instructions would remove judicial discretion and control from the trial proceedings and not allow the flexibility necessary to manage the various situations that arise during a jury trial." State v. Martens (1993),90 Ohio App.3d 338, 343.
 {¶ 45} The court in State v. Williford (1990), 49 Ohio St.3d 247, paragraph three of the syllabus, states: "[w]here the trial court fails to give a complete or correct jury instruction on the elements of the offense charged and the defenses thereto which are raised by the evidence, the error is preserved for appeal when the defendant objects in accordance with [Crim.R. 30(A)] * * *." The failure to object before the jury retires constitutes a waiver absent plain error. Id. at 251.
 {¶ 46} In the case sub judice, appellant alleges that the trial court's use of the language to the jury "at all times in question" rather than "at the time in question," with respect to purpose, is obviously patently erroneous. Appellant contends that the prosecution brought this error to the attention of the trial judge because the jury asked a question in which it had difficulty determining when "at all times in question" should begin. The trial court, however, found that the disparity in the meaning between the given instructions and appellee's correction was a "distinction without a difference." Appellant argues that the trial court was wrong and that its instruction confused the jury. Appellant stresses that absent this erroneous instruction, the outcome of the trial would have been different.
 {¶ 47} According to appellant, the trial court's instruction separated purpose and action so that each may have existed independently of the other. The trial court sought to supplement its written response to the jury's question by bringing the jury back into court and re-instructing them as to the definition of "purpose." Defense counsel objected and moved for a mistrial. However, because the jury returned a verdict during the in-chambers debate, the trial court declared the issue moot. Thus, appellant argues that he was denied his rights to due process and a fair trial. We disagree.
 {¶ 48} In the instant matter, although defense counsel subsequently objected and moved for a mistrial, counsel did not do so prior to, during, or immediately following the jury instruction. Rather, the prosecution brought this typographical error to the attention of the trial judge and suggested that the jury be re-instructed with language consistent with the Ohio Jury Instructions. At first, the trial judge determined that the deviation constituted a "distinction without a difference." The trial judge then had second thoughts and stated that "* * * it may be prudent to point out to the [j]ury that a perhaps better instruction is at the time in question." However, defense counsel would not comply, objected to any corrections, and threatened the mistrial mantra. At that point, the bailiff informed the court that the jury had reached its verdict. Therefore, by failing to object to the "at all times" language from the outset, as well as so vehemently objecting to any corrections, defense counsel invited the error with which it now complains. As such, pursuant to Seiber, supra, at this juncture, appellant cannot now take advantage of an error he invited or induced.
 {¶ 49} Based on Cooperrider, supra, the foregoing jury instruction does not constitute plain error since there is no showing or evidence that but for the error, the outcome of the trial would have been different. Even assuming arguendo that the "at all times" language was erroneous, the record clearly indicates that defense counsel blocked all efforts to aid in correcting it. Therefore, pursuant to Williford,
supra, the failure to object before the jury retires, absent plain error, constitutes a waiver. Thus, appellant's second assignment of error is without merit.
 {¶ 50} In his third assignment of error, appellant argues that the trial court abused its discretion by providing a confusing and erroneous response to the jury's question regarding the definition of purpose.
 {¶ 51} State v. Montgomery (1990), 61 Ohio St.3d 410, 413, states: "[t]he term `abuse of discretion' `(* * *) connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. (* * *)' State v. Adams
(1980), 62 Ohio St.2d 151, 157 * * *." (Parallel citations omitted.)
 {¶ 52} This court stated in State v. Norwood (Mar. 22, 2002), 11th Dist. No. 2000-L-146, 2002 Ohio App. LEXIS 1325, at 12-15: "When reviewing a trial court's jury instructions, an appellate court must examine the entire jury charge. State v. Porter (1968), 14 Ohio St.2d 10,13. * * * One sentence or one phrase should not be looked at in isolation. Id. * * * Further, generally, jury instructions are viewed in their entirety to determine if they contain prejudicial error. State v.Fields (1984), 13 Ohio App.3d 433, 436. * * *" (Parallel citations omitted.) Thus, even if a jury instruction was inappropriate, if it did not materially affect the outcome of the case, a reversal of the judgment is not justified. Id. at 15.
 {¶ 53} In the case at bar, appellant alleges that when the jury requested a clarification of the definition of purpose, the trial court further confused the jury with an erroneous and even more confusing definition. The jury asked, "where does `at all times' in question begin?" The trial court responded, "[t]he term `at all times in question' may include all events leading up to and/or including the events charged." Defense counsel objected and stated that the proper response should have been that "it begins at the time that [appellant] formed in his mind a purpose to commit an act. To say anything more out of that is misleading to the [j]ury." Thus, appellant argues that the jury convicted appellant of using confusing and erroneous instructions. We disagree.
 {¶ 54} The fact that the trial court added language which permitted the jury to consider appellant's state of mind before he committed the actions at issue, as well as at the time that he committed them, does not render the charge defective. Based on Norwood, supra, considering the jury instructions in their entirety, no prejudicial error is apparent since the jury was required to find appellant's specific intent to commit the crimes in question. Even assuming arguendo that the instruction was inappropriate, it did not materially affect the outcome of this case. Therefore, the trial court did not abuse its discretion in its response to the jury's question regarding the definition of purpose. Thus, appellant's third assignment of error is without merit.
 {¶ 55} In his fourth assignment of error, appellant contends that his convictions are against the manifest weight of the evidence.
 {¶ 56} As this court stated in State v. Schlee (Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, at 13-15:
 {¶ 57} "`Sufficiency' challenges whether the prosecution has presented evidence on each element of the offense to allow the matter to go to the jury, while `manifest weight' contests the believability of the evidence presented.
 {¶ 58} "* * * [M]anifest weight' requires a review of the weight of the evidence presented, not whether the state has offered sufficient evidence on each element of the offense.
 {¶ 59} "`In determining whether the verdict was against the manifest weight of the evidence, "(* * *) the court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. (* * *)"' (Citations omitted.) * * *" (Emphasis sic.)
 {¶ 60} A judgment of a trial court should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." State v.Thompkins (1997), 78 Ohio St.3d 380, 387.
 {¶ 61} In the case sub judice, appellant argues that there is little evidence against him other than his own statements to the police, which should have been excluded by the trial court since his Miranda
rights had not been properly waived. According to appellant, the only other piece of direct evidence against him is Harper's identification to Evans that appellant was involved in the shootings. Appellant stresses, however, that Harper's testimony is unreliable due to the fact that the two assailants were wearing either ski masks or stockings over their heads and, most importantly, Harper was unable to identify appellant in the courtroom.
 {¶ 62} Also, appellant alleges that there was very little circumstantial evidence connecting him to this incident. Appellant contends that committing a previous burglary of Harper's home, as well as wearing black clothing and hanging around with Porterfield on the night at issue are not evidence and cannot lead to the conclusion that he participated in this incident. Furthermore, appellant stresses that Manista was the one who actually bought the weapons and there was no testimony that appellant was in possession of either of the weapons purchased on the night of the incident. Finally, appellant argues that the black clothing taken from Gossett's residence contained no indication of any blood, gunpowder, or other residue which would link appellant to the shootings. As such, appellant alleges that his convictions are against the manifest weight of the evidence. We are not persuaded by appellant's reasoning.
 {¶ 63} As previously discussed in appellant's first assignment of error, appellant voluntarily, knowingly, and intelligently waived hisMiranda rights. Therefore, the trial court did not err by denying appellant's motion to suppress statements. At trial, the jury heard appellant's audio and videotaped confessions, which extensively corroborated the testimony of several witnesses. Appellant admitted that he was involved in purchasing both weapons and that he carried the Mossburg with the pistol grip, and Porterfield toted the SKS rifle during the shootings. Both appellant and Porterfield went to Harper's residence dressed in black clothing to steal drugs and money. Appellant acknowledged that Harper and Karen were on the front porch when they arrived. Appellant stated that he shot the first guy, Bell, when he lunged toward appellant, and shot the second guy, Charles, when he ran for the sliding glass door. Although appellant could only remember firing his gun three times, he admitted to loading eight shells and leaving Harper's home with only two. After the shootings, appellant admitted to wrapping the weapons in plastic and stashing them in a sewer. In fact, Sergeant Pizzulo testified that he namely recovered from the sewer a Mossburg shotgun and an SKS rifle.
 {¶ 64} The jury heard the testimony of Leftheris and Manista, who said that on June 17, 2000, just one week prior to the killings, appellant entered Pete's Gun Shack with Manista and purchased a Mossburg shotgun, an SKS rifle, and ammunition. Manista stated that appellant asked her to purchase the weapons for him, use her name, and gave her the money before they entered the store. Crystal testified that appellant was wearing black clothing on the night at issue. Pursuant to a search of Gossett's home, a black BDU outfit was found in which Gossett did not know to whom it belonged. Also, shortly after the killings, officers located the near empty box for the Mossburg shotgun in Gossett's basement, where appellant admitted to stashing it. O'Malley stated that appellant was not drunk. Both Harper and Karen testified that two armed men dressed in black forced them into Harper's home at gunpoint. While en route to the hospital, Harper identified appellant as one of the assailants to Evans, the paramedic on the scene. Turbok, the firearms examiner, testified that seven cartridges recovered from the crime scene were fired from the SKS rifle, and five of the six shells were extracted from the Mossburg shotgun.
 {¶ 65} Based on the overwhelming evidence presented, as well as appellant's admissions, it was reasonable for the jury to conclude that appellant entered Harper's occupied house with the intent to commit a felony. Appellant purchased two deadly weapons and ammunition one week prior to this deadly incident. Appellant forced Harper and Karen into the home at gunpoint, inflicted fatal blows upon Bell and Charles, and nearly killed Harper. Therefore, based on Schlee and Thompkins, supra, the jury did not clearly lose its way in convicting appellant. Thus, appellant's fourth assignment of error is without merit.
 {¶ 66} For the foregoing reasons, appellant's assignments of error are not well taken. The judgment of the Trumbull County Court of Common Pleas is affirmed.
Judgment affirmed.
Judith A. Christley and Diane V. Grendell, JJ., concur.