[Cite as *State v. Settle*, 2017-Ohio-703.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2015-T-0119** |
| MICHAEL BENJAMIN SETTLE, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Trumbull County Court of Common Pleas, Case No. 2014 CR 00557.

Judgment: Affirmed.

*Dennis Watkins*, Trumbull County Prosecutor, and *LuWayne Annos*, Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481-1092 (For Plaintiff-Appellee).

*Michael A. Partlow*, 112 South Water Street, Suite C., Kent, OH 44240 (For Defendant-Appellant).

THOMAS R. WRIGHT, J.

{¶1} Appellant, Michael Benjamin Settle, appeals his criminal conviction in the Trumbull County Court of Common Pleas on one count of aggravated murder and four other felony offenses. He seeks reversal on the grounds that the jury instructions on the issue of accomplice testimony were flawed; he was denied effective assistance of trial counsel; and the jury verdicts on all five counts were against the manifest weight of the

evidence. For the following reasons, the conviction is affirmed in all respects.

{¶2} In February 2014, Beau Palmer began sharing a home with his girlfriend, Tawny Stewart, and her young child on Linden Avenue in Warren, Ohio. After living by themselves for a short period, Palmer and Stewart agreed to allow Tiffany Cassander to move in with them because she was pregnant and did not have a home. Since James Stein was dating Cassander at the time, Palmer and Stewart also allowed him to move into the home. In addition, since appellant was distantly related to Stewart, he would sometimes be permitted to sleep on the living room couch.

{¶3} Even though only Stewart's name was on the lease, the four housemates agreed to split the costs of living in the home. To pay his share, Palmer made money as a tattoo artist and also sold illegal drugs. One of his steady drug clients was Tyler Meardith, who resided in a nearby apartment on Grant Street. Palmer also occasionally sold illegal drugs to Lisa Prater, who lived in her own home at 918 South Street.

{¶4} On the morning of April 7, 2014, Stewart told Palmer that they would soon be evicted from their house if he did not raise the funds for their monthly rent payment. As a result, Palmer ordered Stein, who sometimes sold drugs on Palmer's behalf, to go and collect as much money as possible from their clients. Appellant went with Stein to help with this task. In the meantime, Palmer attempted to drum up clients for his tattoo business on the internet. When this did not prove successful by mid afternoon, Palmer left the house in order to avoid further confrontation with Stewart.

{¶5} After buying more liquor, Palmer went to Meardith's apartment and found that Stein and appellant were already there trying to collect funds Meardith owed Stein on a prior drug deal. When Meardith convinced the other three men he could not pay

2

the debt at that time, the discussion turned to the possibility of engaging in a robbery to obtain the funds Palmer needed. Initially, the four men agreed to break into a municipal garage for the purpose of taking money and drugs contained in an impounded vehicle. In furtherance of the plan, three of the men, appellant, Palmer, and Meardith, dressed in dark clothing designed to disguise their identities. Joined by a fifth individual, Anthony Bolino, the group left the apartment complex in two vehicles.

{¶6} Supposedly, upon arriving in the area of the municipal garage, the group decided not to go through with the break-in because there were too many people near the garage. After driving around for a short period, the group chose to switch vehicles, parking the two originals and all five men getting into a car owned by Bolino's mother. During this same period, the group decided to burglarize Lisa Prater's home because Palmer was familiar with her as a result of prior drug deals.

{¶7} On the evening in question, Prater had invited James Levels, a long-time friend, over to her home to play backgammon and watch movies. Since other persons leased other sections of the home, Prater and Levels stayed in her bedroom throughout the evening. This room was directly adjacent to the living room where the front door of the home was located.

{¶8} When the group of five men arrived in the area of Prater's home, appellant was in the backseat of the vehicle with Meardith and Stein. According to Meardith and Stein, Bolino pulled past the residence and backed the car into a driveway a few houses down. At that point, a short discussion was had concerning who should actually commit the burglary. Ultimately, it was decided that Palmer would not participate because there was a chance that Prater would recognize him. Therefore, only Meardith and appellant

3

exited the vehicle and walked back to the residence. In addition to their dark clothing, appellant wore a ski mask over his face and Meardith wore a hooded sweatshirt. Only appellant was carrying a firearm.

{¶9} When Meardith knocked on the front door, Prater came from the bedroom to the door, looked through the "peep" hole, and asked who it was without opening the door. Meardith responded that someone had sent them to her home. When Prater did not recognize the name, she yelled through the door that there was no one in the home for them to see and told them to go away. She returned to the bedroom and was about to continue her game with Levels when she heard the door being kicked in. According to Meardith, he was turning to leave the front porch when appellant kicked the door in.

{¶10} Both of the intruders immediately entered Prater's bedroom. According to her, she could not see either of the intruders' faces, but the intruder wearing the ski mask was pointing a firearm at her and Levels. Initially, the man with the firearm, i.e., appellant, ordered the other intruder to search the house. When that intruder returned to the bedroom empty-handed, both Prater and Levels began to protest that they did not have anything of value for the intruders to take.

{¶11} Despite appellant's warning to Levels to remain seated in a chair, he tried to get up a couple of times and walked toward the bedroom door. Each time, appellant told him to sit back down, and Levels complied. After Meardith returned to the bedroom from his search, appellant took a few steps back toward the doorway, and Levels again got up to try to leave. This time, Levels did not stop and tried to walk past appellant. As Levels approached the doorway, appellant shot him.

{¶12} According to Meardith, when appellant fired that first shot, he immediately

4

ran from the bedroom and out the front door. According to Prater, notwithstanding the fact that Levels was injured by the first shot, he still tried to take a couple of steps. As a result, the armed intruder, i.e. appellant, shot Levels a second time, causing him to fall into a dresser. Appellant then backed up through the bedroom doorway, tripped over Prater's dog, and went out on the front porch. Within a few seconds, he reentered the home, came into the bedroom, and shot Prater in the chest as she was lying on the bed. When she tried to get up, appellant shot her a second time in the leg.

{¶13} Following the second shot, appellant again retreated from the home and did not return. Levels immediately died from the gunshot wounds. However, Prater survived her serious wounds and was able to call 911.

{¶14} Upon exiting the home, appellant ran back to the car that was still parked in the adjacent driveway. Meardith did not go back to the car, instead choosing to run back to his apartment. Ultimately, all five men met back at Meardith's place. According to Stein, when he asked appellant what had happened inside the house, appellant said that the man, i.e., Levels, tried to take the gun away, thereby forcing appellant to shoot him. But when Stein asked Meardith the same question, Meardith stated that appellant shot Levels for no reason. Allegedly, Meardith's statement caused appellant to threaten him with harm unless he kept his mouth shut.

{¶15} Since Prater could not provide a description of either of the intruders, the police had no solid leads immediately after the incident. Prior to the end of April 2014, though, Stein approached a city policeman and stated that he had information regarding the Levels murder. After a series of interviews with a city detective, Stein admitted his role in the burglary of the Prater residence. In turn, this led to admissions by Meardith

5

and Palmer. Subsequently, all three men entered into plea agreements with the state, under which they were required to testify against appellant.

{¶16} During the period between the Prater burglary and appellant's arrest, he began dating Diane Boyce. Although the courtship was only two months, appellant married Boyce on June 23, 2014. Both before and after their marriage, he made statements to Boyce concerning the burglary and murder. At one point, he specifically drove her past the location where the incident took place. Prior to appellant's trial, the trial court found that Boyce was competent to testify as to any pre-marital statement made by appellant, so long as she was willing to testify. Boyce agreed to testify for the state.

{¶17} In July 2014, the county grand jury indicted appellant on single counts of aggravated murder, felonious assault, aggravated burglary, aggravated robbery, having a weapon while under a disability, and tampering with evidence. Each of the first four charges also contained firearm specifications. A four-day jury trial then went forward in September 2015. The state primarily relied upon the testimony of Boyce and the three accomplices, Meardith, Palmer, and Stein. The defense did not present any evidence in response. At the close of the evidence, the jury found appellant not guilty on the count of tampering with evidence, but guilty on the remaining five counts and the four firearm specifications.

{¶18} For sentencing purposes, the trial court merged the counts of aggravated burglary, aggravated robbery, and having a weapon while under a disability into the sole aggravated murder count. Thus, appellant was only sentenced for aggravated murder, felonious assault, and the two accompanying firearm specifications for those counts. As

6

to the remaining counts, the trial court imposed consecutive terms of thirty years to life and eight years. In relation to the firearm specifications, the court ordered him to serve two consecutive three-year terms, and further ordered that both of these terms were to run consecutive to the terms on the main counts. Therefore, appellant's aggregate term is forty-four years to life.

{¶19} In this direct appeal of his conviction, appellant raises three assignments for review:

{¶20} "[1.] The trial court erred and abused its discretion by failing to give the jury instruction contained in alternative number two of the Ohio Jury Instructions concerning accomplice testimony.

{¶21} "[2.] The appellant received ineffective assistance of trial counsel.

{¶22} "[3.] The appellant's convictions are against the manifest weight of the evidence."

{¶23} Under his first assignment, appellant challenges the complicity jury instruction because the trial court did not follow verbatim Ohio Jury Instructions (OJI) (2016), Section CR 409.17. He claims that the exclusion of language failed to convey that accomplice testimony is to be reviewed with great caution and grave suspicion.

{¶24} Although OJI is helpful to the formulation of a jury instruction, it is not binding:

{¶25} "'"The instructions found in Ohio Jury Instructions are not mandatory. Rather, they are recommended instructions based primarily upon case law and statutes, crafted by eminent jurists to assist trial judges with correctly and efficiently charging the jury as to the law applicable to a particular case. Requiring a trial court to rigidly follow

7

these instructions would remove judicial discretion and control from the trial proceedings and not allow the flexibility necessary to manage the various situations that arise during a jury trial.'" *State v. Shaffer*, 11th Dist. No. 2001-T-0036, 2003-Ohio-6701, at ¶44, quoting *State v. Martens* (1993), 90 Ohio App.3d 338, 343, 629 N.E.2d 462." *State v. Teachout*, 11th Dist. Lake No. 2006-L-081, 2007-Ohio-1642, ¶20. *See also State v. Morales*, 6th Dist. Lucas No. L-09-1119, 2010-Ohio-3061, ¶18; *State v. Berry*, 159 Ohio App.3d 476, 2004-Ohio-6027, ¶22 (12th Dist.).

{¶26} The trial court's jury instruction regarding accomplice testimony was:

{¶27} "You have heard testimony from Tyler Meardith, Beau Miller (*sic*), James Stein, other persons who have pleaded guilty to crimes charged in this case and are said to be accomplices. An accomplice is one who joins another in the commission of a crime. Whether Tyler Meardith, Beau Palmer and James Stein were accomplices and the weight to give to their testimony are matters for you to determine from all of the facts and circumstances in evidence.

{¶28} "*The testimony of an accomplice that is supported by other evidence does not become inadmissible because of his complicity, moral turpitude or self-interest but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion and require that it be weighed with great caution.*

{¶29} "*It is for you as jurors, in light of all of the facts presented to you from the witness stand to evaluate such testimony and determine its quality and worth or its lack of quality and worth.* An accomplice may have special motive in testifying, and you should carefully examine an accomplice's testimony." (Emphasis added.)

{¶30} The italicized portion of the foregoing quote is worded consistently with a

8

mandated jury instruction set forth in Ohio's complicity statute, R.C. 2923.03. Division (D) of the statute provides that if an alleged accomplice testifies against the defendant during a criminal trial, the trial court must give the jury a specific instruction. Division (D) then provides a quote of the exact instruction to be used. Except for the phrase "that is supported by other evidence" in the first sentence of the italicized language, the trial court in our case quoted the mandated statutory instruction verbatim. To this extent, the instruction complies with the governing state law.

{¶31} As noted above, the last sentence in the trial court's instruction states that an accomplice's testimony must be considered carefully because the accomplice might have a special motive for testifying. This sentence is not italicized in the quote because it is not included in the required instruction under R.C. 2923.03(D). Rather, as appellant correctly points out, the trial court quoted the sentence from a separate source.

{¶32} OJI Section CR 409.17 sets forth two alternative instructions regarding the issue of an accomplice's testimony. A comparison of the trial court's instruction with the two alternatives shows that the court primarily followed Alternative No. 2, which contains three sections. Like the first paragraph of the trial court's instruction, section (A) of the OJI instruction defines who can be considered an accomplice and states that it is for the jury to decide how much weight to afford the testimony of any witness found to be an accomplice. Section (B) then quotes the mandated instruction under R.C. 2923.03(D). Last, section (C) of the OJI instruction provides:

{¶33} "(C) An accomplice may have special motives in testifying, and you should carefully examine an accomplice's testimony and *use it with great caution and view it with grave suspicion*." (Emphasis added.)

9

**{¶34}** Again, none of the language in section (C) is in the mandated instruction under R.C. 2923.03(D). The trial court chose to include the first two phrases of section (C) in its instruction, but did not use the italicized portion. Appellant submits that the decision to exclude the italicized portion rendered the entire instruction flawed.

**{¶35}** Although the italicized portion of section (C) is not included in R.C. 2923.03(D), that instruction contains similar language. That is, the statutory instruction states that the admitted complicity of a witness can affect his credibility "and make his testimony subject to grave suspicion, and require that it be weighed with great caution." In light of the fact that the trial court quoted all of the R.C. 2923.03(D) instruction, the foregoing language was read to the jury.

**{¶36}** Appellant maintains that, by both quoting the entire statutory instruction in section (B) in its proposed instruction and then including additional "great caution-grave suspicion" language in section (C), the authors of the OJI instruction believed the point was so important that it had to be emphasized to the jury. However, once the trial court quoted the entire R.C. 2923.03(D) instruction, the jury was fully aware that it must view the testimony of appellant's three accomplices with great caution and grave suspicion. To this extent, the "great caution-grave suspicion" language in section (C) is repetitive and did not add anything of substance to the trial court's instruction.

**{¶37}** "An appellate court reviews a trial court's decision to give a particular set of jury instructions under an abuse of discretion standard. *State v. Martens*, 90 Ohio App.3d 338, 343, 629 N.E.2d 462 (3d Dist.1993). If, however, the jury instructions incorrectly state the law, then an appellate court will conduct a de novo review to determine whether the incorrect jury instruction probably misled the jury in a matter

10

materially affecting the complaining party's substantial rights. *State v. Kovacic*, 11th Dist. No. 2010-L-018, 2010-Ohio-5663, ¶17. Furthermore, an appellate court must review jury instructions in the context of the entire charge. *State v. Hardy*, 28 Ohio St.2d 89, 92, 276 N.E.2d 247 (1971), In *Hardy*, the court held:

**{¶38}** "'In determining the question of prejudicial error in instructions to the jury, the charge must be taken as a whole, and the portion that is claimed to be erroneous or incomplete must be considered in its relation to, and as it affects and is affected by the other parts of the charge. If from the entire charge it appears that a correct statement of the law was given in such a manner that the jury could not have been misled, no prejudicial error results'" *State v. Barker*, 11th Dist. Portage No. 2010-P-0044, 2012-Ohio-522, ¶91-92.

**{¶39}** Considered as a whole, the trial court's instruction concerning the jury's consideration of accomplice testimony correctly states the governing law and did not mislead the jury as to how it was required to view such testimony. Thus, as the court did not abuse its discretion, appellant's first assignment lacks merit.

**{¶40}** Under his next assignment, appellant asserts that he was denied effective assistance of trial counsel when his attorney failed to timely object to certain testimony given by Diane Boyce during her direct testimony. In response to a specific question by the prosecutor, Boyce testified that appellant expressly asked her to provide an alibi for him in relation to the night of the incident, but that she refused his request because her relationship with appellant did not begin until approximately ten days after the incident. Appellant argues that his attorney should have immediately objected because, prior to asking the question, the state did not lay a proper foundation as to whether the request

11

for an alibi was made before they were married in June 2014. He further argues that if a timely objection had been made, trial counsel could have moved the trial court for an in-chamber hearing during which Boyce could have testified concerning when the alibi request was made.

**{¶41}** As noted above, as part of a pre-trial determination, the trial court held that Boyce was only competent to testify regarding statements appellant made to her prior to their marriage. Accordingly, if the alibi request was made post-marriage, the testimony in question was inadmissible. The record verifies that trial counsel made no objection when the issue of the alibi request was initially raised. However, at the end of Boyce's direct testimony, appellant's counsel asked for a side-bar conference, during which he moved the trial court for permission to cross-examine Boyce about a letter she wrote to appellant while he was being held in the county jail. According to trial counsel, Boyce said in the letter that she and appellant were together the night of the incident.

**{¶42}** At that point, the trial proceedings were suspended, and an in-chambers hearing was held. Boyce was then specifically questioned concerning when she wrote the letter to appellant. But no questions were asked as to when appellant made his oral request to her to provide him an alibi for the underlying crime. The only reference to the timing of the alibi request was made by the prosecutor, who stated in-chambers that the alibi request was mentioned in a copy of a text message that the police photographed on May 12, 2014, more than a month before appellant and Boyce were married.

**{¶43}** Given the trial court's pre-trial ruling regarding Boyce's testimony, the lack of an objection to Boyce's alibi testimony would only be prejudicial if appellant made the request after they were married. Since Boyce was never questioned as to the timing of

the alibi request, it cannot be determined, based upon the record in this appeal, whether trial counsel's failure to object was prejudicial.

{¶44} As a general proposition, "defense counsel is not ineffective unless his or her performance fell below an objective standard of reasonable representation, and the defendant is prejudiced from that performance. *State v. Bradley*, 42 Ohio St.3d 136, 143, 538 N.E.2d 373 (1989)." *State v. Long*, 11th Dist. Lake No. 2013-L-102, 2014-Ohio-4416, ¶29. Given the lack of any direct evidence demonstrating that appellant's alibi request to Diane Boyce was made after their marriage, he cannot meet the second requirement for ineffective assistance of trial counsel. Appellant's second assignment is also without merit.

{¶45} Under his third assignment, appellant maintains his conviction on all five charges must be reversed as against the manifest weight of the evidence. He contends that the testimony of the three accomplices, Meardith, Palmer, and Stein, contained so many inconsistencies that the jury should have found all three incredible. According to appellant, the discrepancies between the three versions of events were so great that a reasonable juror could only find that all three men were lying about his involvement in the incident in order to obfuscate their own involvement in the robbery and murder.

{¶46} Appellant focuses upon the testimony of the three accomplices because, according to him, they were the only state witnesses who directly connected him to the crimes in question. But the record shows otherwise. During her direct testimony, Boyce quoted appellant as telling her that the first robbery/murder in the City of Warren for the year 2014 was "his." In conjunction with this statement, he specifically drove her to the street where Prater lived and pointed to the place where the crimes occurred.

13

{¶47} As to the three accomplices, the record demonstrates that, in regard to the events that occurred prior to the outset of the burglary, Palmer's testimony significantly differed from that of Meardith and Stein. For example, according to Palmer, Bolino did not park the vehicle in a driveway immediately before appellant and Meardith got out and walked toward the residence; instead, Palmer testified that Bolino stopped the car in the street, let appellant and Meardith out, and then circled the block while they went inside the Prater residence. However, Palmer further testified that he had been drinking hard liquor the entire day before the group left Meardith's apartment to commit the robbery. This explains why his memory of the events was not as clear the other accomplices. In addition, many aspects of Palmer's testimony were consistent with the version told by Meardith and Stein. As to the robbery, Palmer stated that it was appellant and Meardith who exited the vehicle near Prater's home, that only appellant got back into the vehicle after the robbery was over, and that appellant smelled like gunpowder after the incident.

{¶48} The testimonies of Meardith and Stein were fairly consistent in regard to the important facts of the incident. Appellant contends that these witnesses gave conflicting testimony as to the location of the car during the robbery. The record does not support this contention. Both Meardith and Stein testified that Bolino backed the vehicle into the driveway of a structure a few houses down from the Prater residence. As to this point, the only difference between their versions was that Meardith thought the driveway was to an apartment complex, while Stein stated the driveway was to a house. Moreover, to the extent that they were both able to testify as the specifics of the robbery, Meardith's and Stein's testimonies did not conflict; i.e., both men testified that it

14

was appellant and Meardith who exited the vehicle and walked up to the residence, and that appellant had possession of the firearm.

**{¶49}** Meardith was the only accomplice who could testify as to the events inside the Prater residence. Although minor aspects of his testimony conflicted with Prater's testimony, their respective versions were essentially consistent concerning the events that took place until Levels was shot for the first time. Furthermore, there was no part of Meardith's testimony which was so incredulous as to render his entire version of the events unbelievable.

**{¶50}** In addition, during each of the three accomplices' testimony, the nature of their plea agreements with the state was fully explained. Moreover, defense counsel had the opportunity to cross-examine each accomplice as to their motives for testifying. Thus, the jury was fully aware of challenges to the accomplices' credibility as part of its deliberations.

**{¶51}** "[A] manifest-weight challenge 'concerns "the inclination of the *greater amount of credible evidence * * ** to support one side of the issue rather that the other."'" (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997 Ohio 52, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed. 1990). A manifest-weight challenge requires us to consider the entire record, including the credibility of the witnesses, the weight of the evidence, and any reasonable inferences and determine whether "'the [jury] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial order.'" *Id.*, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 20 Ohio B. 215, 485 N.E.2d 717 (1st Dist.1983); accord R.C. 2953.02." *State v. Montgomery,* 2016-Ohio-5487, __ N.E.3d__, ¶75.

{¶52} In this case, appellant has not established that the jury lost its way or that a manifest miscarriage of justice took place. The state presented substantial credible evidence demonstrating that appellant broke into the Prater residence, murdered Levels with the firearm he was carrying, and then shot Prater twice. Hence, since appellant's conviction on the five charges was not against the manifest weight of the evidence, his third assignment is not well-taken.

{¶53} The judgment of the Trumbull County Court of Common Pleas is affirmed.


DIANE V. GRENDELL, J.,

COLLEEN MARY O'TOOLE, J.,

concur.