[Cite as *State v. Taylor*, 2022-Ohio-3611.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## PORTAGE COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

- v -

HENRY TAYLOR, JR.,

        Defendant-Appellant.

**CASE NO. 2021-P-0052**

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2020 CR 00977

---

## O P I N I O N

Decided: October 11, 2022
Judgment: Affirmed

---

*Victor V. Vigluicci*, Portage County Prosecutor, and *Pamela J. Holder*, Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Plaintiff-Appellee).

*Thomas Rein*, 820 Superior Avenue, Suite 800, Cleveland, OH 44113 (For Defendant-Appellant).

THOMAS R. WRIGHT, P.J.

{¶1} Appellant, Henry Taylor, Jr., appeals his convictions of felonious assault and domestic violence following a jury trial. We affirm.

## I. Introduction

{¶2} In December 2020, the Portage County Grand Jury returned an indictment charging appellant with one count each of aggravated robbery, a first-degree felony, in violation of R.C. 2911.01; kidnapping, a first-degree felony, in violation of R.C. 2905.01; felonious assault, a second-degree felony, in violation of R.C. 2903.11; and domestic

violence, a first-degree misdemeanor, in violation of R.C. 2919.25. The indictment alleged that appellant committed the offenses against a single victim on or about December 21, 2020.

{¶3} A three-day jury trial was held in March 2021. The prosecution called several witnesses: a 9-1-1 caller, a 9-1-1 supervisor, two road officers, a detective, an emergency room physician, a custodian of medical records, and the victim, albeit on cross-examination. At the close of the state's case, the defense moved for a Crim.R. 29 judgment of acquittal. The trial court granted the motion as to the charge of kidnapping. The defense rested without presenting any witnesses. The jury returned guilty verdicts on the charges of felonious assault and domestic violence; it could not reach a decision as to the charge of aggravated robbery. The trial court imposed a minimum prison term of six years to a maximum term of nine years for the offense of felonious assault and six months for the offense of domestic violence, to run concurrently. The sentencing entry was journalized on April 29, 2021.

{¶4} From the final judgment of conviction, appellant advances five assignments of error.

## II. Sufficiency and Manifest Weight

{¶5} Appellant's first two assigned errors challenge the legal sufficiency and weight of the evidence:

> [1.] The State failed to present sufficient evidence to sustain a conviction against Appellant.
>
> [2.] Appellant's convictions are against the manifest weight of the evidence.

2

{¶6} "Whether the evidence is legally sufficient to sustain a verdict is a question of law." (Citation omitted.) *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997); *State v. Davis*, 11th Dist. Lake No. 2019-L-170, 2021-Ohio-237, ¶ 187. "In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *State v. Dent*, 163 Ohio St.3d 390, 2020-Ohio-6670, 170 N.E.3d 816, ¶ 15, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "In essence, sufficiency is a test of adequacy." *Thompkins* at 386.

{¶7} In contrast, a challenge to the manifest weight of the evidence "concerns 'the inclination of the *greater amount of credible evidence* * * * to support one side of the issue rather than the other.'" (Emphasis sic.) *Id.* at 387, quoting *Black's Law Dictionary* 1594 (6th Ed.1990). In reviewing the manifest weight of the evidence, we must "consider the entire record, including the credibility of the witnesses, the weight of the evidence, and any reasonable inferences, and determine whether "'the [jury] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."'" *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 75, quoting *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983); *State v. Settle*, 2017-Ohio-703, 86 N.E.3d 35, ¶ 51 (11th Dist.)

{¶8} A conclusion that the jury verdict is not against the manifest weight of the evidence necessarily means it was supported by sufficient evidence. *State v. Masters*, 11th Dist. Lake No. 2019-L-037, 2020-Ohio-864, ¶ 17. Thus, the appellate court need

3

not engage in a separate analysis of sufficiency if it determines the verdict is not against the manifest weight. *Id.*

{¶9} To convict appellant, the state was required to prove the following elements beyond a reasonable doubt: Domestic violence: "No person shall knowingly cause or attempt to cause physical harm to a family or household member." R.C. 2919.25(A). Felonious assault: "No person shall knowingly * * * [c]ause serious physical harm to another * * *." R.C. 2903.11(A)(1). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶10} "Family or household member" includes a "person living as a spouse," which means "a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question." R.C. 2919.25(F)(1)(a)(i) and (2).

{¶11} "'Physical harm to persons' means any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). "'Serious physical harm to persons' means any of the following:

> (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
>
> (b) Any physical harm that carries a substantial risk of death;
>
> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

4

Case No. 2021-P-0052

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5).

{¶12} Testimony from trial witnesses revealed the following:

{¶13} On December 21, 2020, at 5:00 a.m., Kathryn Scott was driving to work on State Route 5. It was a very cold morning. Ms. Scott observed what she initially thought was a coyote on the opposite side of the road. As she got closer, she realized the figure was a person, who was on their hands and knees in the middle of the road. Ms. Scott, who was traveling alone, called 9-1-1 but did not remain on scene. The 9-1-1 recording was played for the jury.

{¶14} Deputy Dustin Henry Diemert was dispatched to State Route 5 in response to several callers reporting a female subject crawling on the roadway without shoes in the 20- to 30- degree weather. This area of State Route 5 is a two-lane roadway with a speed limit of 55 miles per hour; it is a rural area, dark with no streetlights, and few houses located far off the roadway. Deputy Diemert observed two bystanders and a female on the ground. He testified that "she has no shoes on, her hair is all over the place, her clothing had black marks, almost like she was dragged from the asphalt of the concrete, clothes were ripped. * * * She was crying, on the ground shivering, shaking and just very disoriented." Deputy Diemert placed the female into his warm vehicle and called for an ambulance.

5

Case No. 2021-P-0052

{¶15} The female (hereinafter "the Victim") identified herself to Deputy Diemert and repeatedly stated that her feet hurt and that her head was heavy. She appeared to be in shock, suffering from pain in her feet, head, and had visible swelling to her jaw. She also smelled strongly of alcohol. The Victim eventually disclosed to the deputy that her boyfriend, appellant, assaulted her and stole her car, in which were her purse, wallet, and shoes. She identified the make and model of her vehicle and a BMV image of appellant.

{¶16} The Victim told Deputy Diemert that she and appellant were driving when they got into a verbal altercation. Appellant hit her in the face and head with closed fists. At a gas station, the Victim lied about having to use the restroom and instead called her father. Appellant decided to return home and, while driving, again struck the Victim in the head and face with a closed fist. The Victim grabbed the steering wheel to pull the car over or crash the car in order to stop the beating. Appellant stopped the car, and the Victim jumped out. Appellant chased her down, tackled her to the ground, and continued beating her head and face with a closed fist. The Victim refused to stand up, and appellant dragged her back to the car as she was screaming and crying. The Victim said that appellant kicked her in the ribs, left her on the ground, and took her vehicle.

{¶17} Trooper Tyler Totani also responded to the scene. He testified that it was cold, and the Victim was not dressed for the weather. She was hysterical, had no shoes on, and complained about pain to her face. Trooper Totani testified that the Victim had to be physically picked up and placed into the vehicle because she was not able to get there on her own.

{¶18} The Victim was transported to the hospital by ambulance. Dr. Gwendlyn Fletcher, an emergency medicine physician, treated the Victim the morning of December

6

21, 2020. Dr. Fletcher testified that the Victim presented with sizable abrasions on her chest and back from direct contact with the ground and a large hematoma on the right side of her forehead. Dr. Fletcher ordered multiple CT scans, which showed fractures of the fifth, sixth, seventh, and eighth ribs on her left side and a fracture of the second rib on her right side.

{¶19} Dr. Fletcher testified that the Victim reported that her boyfriend assaulted her and left her at the side of the road. On cross-examination, Dr. Fletcher stated the Victim reported that her injuries were from being assaulted both by hitting and kicking. Dr. Fletcher also agreed that the medical records contain a notation that the Victim stated she jumped from a moving vehicle. The medical records contain a surgical resident's note that the Victim thought the rib fractures might have been from a former fight with her boyfriend. Dr. Fletcher could not determine when the rib fractures occurred, but she did not recall the Victim stating that they had occurred prior to December 21, 2020. The doctor testified, and the State stipulated, that the Victim's blood alcohol level at the time of her examination was 127 milligrams per deciliter, which would be an illegal level for driving in Ohio.

{¶20} Detective Springer interviewed the Victim at the hospital the morning of December 21, 2020. He identified photographs that were taken of the Victim that morning at the hospital, as well as photographs of the clothing she was wearing. The photographs were shared with the jury. Detective Springer testified that appellant's version of events at the time of his arrest was "inconsistent" with the Victim's version of events. Appellant told the detective that he was with the Victim and had left her on the road, but he denied assaulting the Victim.

7

Case No. 2021-P-0052

{¶21} The Victim was called and examined by the prosecution as a reluctant witness. She identified appellant as her fiancé and the individual that she was living with in December 2020. The Victim testified that they had both been drinking that night and that she was highly under the influence. She also told that jury that the State forced her to be a witness by threatening that she would never see her daughter again unless she complied with the subpoena to appear.

{¶22} The Victim's trial testimony was different from the information that she gave to the officers who found her on State Route 5 and from the information she gave to the emergency room physician who treated her injuries. She claimed that she lied to the officers. At trial, the Victim testified that she grabbed the steering wheel because she was trying to kill both of them by driving into a semi-truck; appellant had saved them; she hit appellant in the head; she jumped out of the car without shoes on and took off running.

{¶23} Appellant contends that the jury's guilty verdicts are not supported by sufficient evidence to link him to the crimes and that there is insufficient evidence of "serious physical harm" to support the felonious assault conviction. Appellant further argues his convictions are against the manifest weight of the evidence because the only evidence linking him to the crimes are his association with the Victim coupled with Detective Springer's improper testimony as to appellant's credibility. Specifically, appellant complains of the detective's statement that appellant's version of events was "inconsistent with what [the Victim] said." Appellant also takes issue with the Victim's admission on the stand that she had been under the influence for the past eight weeks, staying awake three and four days in a row.

8

{¶24} Contrary to appellant's arguments, we cannot say that the jury lost its way in finding appellant guilty of felonious assault and domestic violence. The jury heard the 9-1-1 call, how the Victim appeared when found by responding officers, and what the Victim told the emergency and medical personnel as to how she became injured and left on the road. At the scene, the Victim identified appellant as her assailant and provided specific details of the assault. And the victim needed to be physically placed in a vehicle by the officers because she could not get there on her own. In the emergency room, the Victim again identified appellant as her assailant, and the exam revealed multiple serious injuries—fractured ribs, a large hematoma on the forehead, swollen jawline, etc. The visible injuries were photographed by investigators that day. The evidence supports a conclusion that these injuries amounted to "serious physical harm," in that the victim suffered "some temporary, substantial incapacity." *See* R.C. 2901.01(A)(5)(c). At trial, the Victim was a reluctant witness, claiming she was unable to recall any prior statements, assuming the blame for appellant's conduct.

{¶25} Appellant's convictions are not against the manifest weight of the evidence. And, upon finding that his convictions are not against the manifest weight of the evidence, they are also necessarily supported by sufficient evidence. *See State v. Struble*, 2019-Ohio-4650, 148 N.E.3d 24, ¶ 35 (11th Dist.).

{¶26} Appellant's first and second assigned errors lack merit.

## III. Trial Rights

{¶27} Appellant's third assigned error contends:

> [3.] Appellant was denied a fair trial and his right to due process by the trial court by forcing Appellant be shackled in front of the jury throughout the whole trial.

9

Case No. 2021-P-0052

{¶28} Appellant argues the trial court violated his rights to a fair trial and due process by ordering that his feet be secured and his hands secured at his hips with a hip chain while in the courtroom.

{¶29} "No one should be tried while shackled, absent unusual circumstances. The use of restraints tends to erode the presumption of innocence that the justice system attaches to every defendant." (Internal citations omitted.) *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 82; *Deck v. Missouri*, 544 U.S. 622, 628-629, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005) (a criminal defendant has the right to remain free of physical restraints that are visible to the jury). "But it is widely accepted that a prisoner may be shackled when there is a danger of violence or escape. The decision to require restraints is left to the sound discretion of the trial court, which is in a position to consider the prisoner's actions both inside and outside the courtroom, as well as his demeanor while the court is in session." (Internal citations omitted.) *Neyland* at ¶ 82; *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 79 ("a court need not sit by helplessly waiting for a defendant to commit a violent or disruptive act in the courtroom before being cloaked with the power to invoke extra security measures").

{¶30} The trial court held a hearing on the state's pretrial motion to secure and restrain appellant throughout the trial. A recording was played of a jail call between appellant and the Victim, in which appellant stated his plan was "to grab a chair, throw it at the Judge, get a gun, shoot the prosecutor and shoot the Judge." The state relayed to the court that other prosecutors had warned of appellant's courtroom behavior, as he had caused a mistrial in a neighboring jurisdiction by "acting out violently" in the courtroom.

10

There was also discussion as to whether appellant should be restrained in the courtroom or in another room for viewing the trial.

{¶31} The morning of trial, citing *Neyland*, the trial court ruled that appellant would be restrained in the courtroom because there was a danger of violence. The court observed the following:

> [H]e does have on clothing that it is certainly not easy to see unless you are really looking for those chains. He has long sleeves on, he has a suit coat on. When he stands, when the jury enters, if he crosses his hands in front of his waist, you're not able to see that chain going around his belly area. We did it a couple times to make sure that that was the case. I'm certainly not opposed to the defense making those efforts and ensuring that when he stands up, that is not visible.

{¶32} Appellant claims the court should have first forewarned him that any improper actions on his part would result in restraints and that, after he had caused no disturbances, the court should have granted defense counsel's request later in the trial to remove the restraints. He has failed to establish, however, that the trial court's decision was an abuse of discretion or a violation of his rights to a fair trial and due process. The decision was based upon clear threats appellant made regarding his anticipated conduct at trial toward the judge and other court personnel. The trial court took measures to assure that the restraints would not be visible to the jury, and the record does not reflect that the jury observed the restraints.

{¶33} Appellant's third assigned error lacks merit.

{¶34} Appellant's fourth assigned error contends:

> [4.] The trial court violated Appellant's rights by not allowing him to be present in open court for his sentencing hearing.

11

**{¶35}** Appellant challenges the trial court's decision to hold a sentencing hearing without allowing him to be physically present due to his prior threats of violence. Appellant was present via video-link from the jail.

**{¶36}** A defendant "has a fundamental right to be present at all critical stages of his criminal trial." *State v. Hill*, 73 Ohio St.3d 433, 444, 653 N.E.2d 271 (1995). *See also* Section 10, Article 1, Ohio Constitution ("In any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel[.]"); R.C. 2945.12 ("No other person [other than a person indicted for a misdemeanor] shall be tried unless personally present[.]").

**{¶37}** Procedurally, Crim.R. 43(A)(1) provides that "the defendant must be physically present at every stage of the criminal proceeding and trial, including * * * the imposition of sentence, except as otherwise provided by these rules." In felony cases, "the court may permit the presence and participation of a defendant by remote contemporaneous video for any proceeding," but only where the defendant has waived, "in writing or on the record, the defendant's right to be physically present under these rules with leave of court." Crim.R. 43(A)(2)-(3). The court may also conduct proceedings in the defendant's absence or by remote contemporaneous video where the defendant's "conduct in the courtroom is so disruptive that the hearing or trial cannot reasonably be conducted with the defendant's continued physical presence." Crim.R. 43(B).

**{¶38}** A trial court may commit reversible error when it imposes sentence without complying with the mandatory provisions of Crim.R. 43. *See State v. Welch*, 53 Ohio St.2d 47, 48, 372 N.E.2d 346 (1978). "An accused's absence, however, does not necessarily result in prejudicial or constitutional error. '[T]he presence of a defendant is

12

a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.'" (Parallel citations omitted.) *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 90, quoting *Snyder v. Massachusetts*, 291 U.S. 97, 107-108, 54 S.Ct. 330, 78 L.Ed. 674 (1934), *overruled on other grounds*; *see also State v. Williams*, 6 Ohio St.3d 281, 286, 452 N.E.2d 1323 (1983), and *State v. Conway,* 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 50.

{¶39} Here, no waiver appears in writing or on the record, and there is no documentation of disruptive courtroom behavior by appellant. Accordingly, the trial court failed to comply with Crim.R. 43 by imposing sentence without appellant physically present at the hearing. Nevertheless, appellant has not shown prejudice resulted from his presence at the hearing via video-link. Appellant's interests were represented by defense counsel who was physically present in the courtroom; no objection was raised as to his physical absence; appellant was able to see and hear the courtroom and to be seen and heard by the courtroom; although he chose not to, appellant was permitted the opportunity to make a statement; and appellant advances no argument on appeal that his physical absence prevented a fair hearing. Accordingly, we conclude that the trial court's failure to comply with Crim.R. 43 amounts to harmless error.

{¶40} Appellant's fourth assigned error is without merit.

## IV. Constitutionality of the Reagan Tokes Law

{¶41} Appellant's fifth assigned error contends:

> [5.] The trial court erred by imposing an indefinite prison sentence upon Appellant which is unconstitutional.

13

Case No. 2021-P-0052

**{¶42}** Appellant argues that the sentencing scheme under which he was sentenced, identified under R.C. 2901.011 as the Reagan Tokes Law, is unconstitutional on its face because it violates the separation of powers doctrine and infringes upon his due process rights.

**{¶43}** Initially, we note that the constitutionality of the Reagan Tokes Law has been addressed by this and other Ohio appellate courts, each of which has declared that the sentencing scheme does not facially violate an inmate's constitutional rights. *See, e.g., State v. Joyce,* 11th Dist. Lake No. 2021-L-006, 2022-Ohio-3370; *State v. Barnes*, 2d Dist. Montgomery No. 28613, 2020-Ohio-4150; *State v. Hacker*, 2020-Ohio-5048, 161 N.E.3d 112 (3d Dist.); *State v. Bontrager*, 2022-Ohio-1367, 188 N.E.3d 607 (4th Dist.); *State v. Ratliff*, 2022-Ohio-1372, 190 N.E.3d 684 (5th Dist.); *State v. Maddox*, 2022-Ohio-1350, 188 N.E.3d 682 (6th Dist.); *State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.) (en banc); *State v. Guyton*, 12th Dist. Butler No. CA2019-12-203, 2020-Ohio-3837. The issue is currently pending before the Supreme Court of Ohio. *See, e.g., State v. Hacker*, Sup. Ct. Case No. 2020-1496, and *State v. Simmons*, Sup. Ct. Case No. 2021-0532.

### A. Standard of Review

**{¶44}** We review the constitutionality of a statute de novo, i.e., independently and without deference to the trial court's decision. *State v. Jenson*, 11th Dist. Lake No. 2005-L-193, 2006-Ohio-5169, ¶ 5. "An enactment of the General Assembly is presumed to be constitutional, and before a court may declare it unconstitutional it must appear beyond a reasonable doubt that the legislation and constitutional provisions are clearly incompatible." *State ex rel. Dickman v. Defenbacher*, 164 Ohio St. 142, 128 N.E.2d 59

14

(1955), paragraph one of the syllabus; *State v. Romage*, 138 Ohio St.3d 390, 2014-Ohio-783, 7 N.E.3d 1156, ¶ 7 ("enactments of the General Assembly enjoy a strong presumption of constitutionality"). "This means that courts must avoid an unconstitutional construction where it is reasonably possible to do so." *Jenson* at ¶ 5, citing *United Air Lines, Inc. v. Porterfield*, 28 Ohio St.2d 97, 100, 276 N.E.2d 629 (1971). "Further, the party challenging the statute bears the burden of proving the unconstitutionality of the statute beyond a reasonable doubt." *Woods v. Telb*, 89 Ohio St.3d 504, 511, 733 N.E.2d 1103 (2000), citing *State v. Thompkins*, 75 Ohio St.3d 558, 560, 664 N.E.2d 926 (1996).

**{¶45}** A party may challenge a statute as unconstitutional as applied to a particular set of facts or, as here, on its face. *Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 37. "A facial challenge to a statute is the most difficult to bring successfully because the challenger must establish that there exists no set of circumstances under which the statute would be valid. The fact that a statute might operate unconstitutionally under some plausible set of circumstances is insufficient to render it wholly invalid." *Id.*, citing *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

B. The Reagan Tokes Law

**{¶46}** The Reagan Tokes Law, effective as of March 22, 2019, implemented a system of indefinite sentencing for non-life felonies of the first and second degree committed on or after the effective date. Pursuant to the Reagan Tokes Law, a sentencing court imposing a prison term under R.C. 2929.14(A)(1)(a) or (2)(a) is required to order a minimum prison term under that provision and a maximum prison term as determined by R.C. 2929.144(B).

15

**{¶47}** "Of the many changes to Ohio's criminal sentencing scheme that were brought about by the Reagan Tokes Law, the change that is most pertinent to our present discussion centers around R.C. 2967.271(B)-(F), which permits prison authorities within the executive branch to hold defendants in confinement during the indefinite portion of their sentence for conduct that violates prison rules and regulations." *State v. Eaton*, 6th Dist. Lucas No. L-21-1121, 2022-Ohio-2432, ¶ 13.

**{¶48}** R.C. 2967.271(B) sets forth a "presumption that the person shall be released from service of the sentence on the expiration of the offender's minimum prison term or on the offender's presumptive earned early release date, whichever is earlier." R.C. 2967.271(C) provides that the Ohio Department of Rehabilitation and Correction ("ODRC") may rebut the presumption for release if it holds a hearing and determines that any of the three enumerated factors, discussed below, are applicable. If the ODRC rebuts the presumption for release, R.C. 2967.271(D)(1) provides that the ODRC may "maintain" the offender in confinement for a "reasonable period," which "shall not exceed the offender's maximum prison term." R.C. 2967.271(E) provides that the ODRC "shall provide notices of hearings to be conducted under division (C) or (D) of this section in the same manner, and to the same persons," as it provides for the possible release of inmates on parole. Finally, R.C. 2967.271(F) permits the director of the ODRC to recommend a reduction in the offender's minimum prison term (except for sexually oriented offense convictions), which creates a presumption in favor of the reduction that may be rebutted by the prosecutor at a hearing before the sentencing court.

**{¶49}** Although indefinite sentencing has previously been utilized as the law in Ohio for first- and second-degree felonies, the presumptive release date is novel to the

16

Reagan Tokes Law. *See State v. Wolfe*, 5th Dist. Licking No. 2020CA00021, 2020-Ohio-5501, ¶ 56 (Gwin, J., dissenting), citing *State v. Davis,* 9th Dist. Summit No. 13092, 1987 WL 25743 (Nov. 25, 1987), citing former R.C. 2929.11, and *State v. Jenks,* 2d Dist. Montgomery No. 10264, 1987 WL 20267 (Nov. 16, 1987), citing former R.C. 2929.1.

### C. Separation of Powers Doctrine

{¶50} Appellant initially argues that the Reagan Tokes Law violates the separation of powers doctrine. "The Ohio Supreme Court has said that '[t]he administration of justice by the judicial branch of the government cannot be impeded by the other branches of the government in the exercise of their respective powers.'" *State v. Ferguson*, 2d Dist. Montgomery No. 28644, 2020-Ohio-4153, ¶ 21, quoting *State ex rel. Johnston v. Taulbee*, 66 Ohio St.2d 417, 423 N.E.2d 80 (1981), paragraph one of the syllabus.

{¶51} In arguing that the Reagan Tokes Law violates the separation of powers, offenders generally rely on *State ex rel. Bray v. Russell*, 89 Ohio St.3d 132, 729 N.E.2d 359 (2000), where the Supreme Court of Ohio held unconstitutional former R.C. 2967.11, commonly known as "the bad-time law." The relevant portion of the bad-time law, provided that "[a]s part of a prisoner's sentence, the parole board may punish a violation committed by the prisoner *by extending the prisoner's stated prison term* for a period of fifteen, thirty, sixty, or ninety days in accordance with this section." (Emphasis added.). R.C. 2967.11(B)

{¶52} The *Bray* Court concluded that the various provisions of former R.C. 2967.11 enabled "the executive branch to prosecute an inmate for a crime, to determine whether a crime has been committed, and to impose a sentence for that crime. This is no less than the executive branch's acting as judge, prosecutor, and jury. R.C. 2967.11

17

Case No. 2021-P-0052

intrudes well beyond the defined role of the executive branch as set forth in our Constitution." *Bray* at 135.

{¶53} However, after deciding *Bray*, the Ohio Supreme Court decided *Woods*, 89 Ohio St.3d 504, "holding that the post-release-control statute did not violate the separation-of-powers doctrine." *Ferguson*, 2020-Ohio-4153, at ¶ 22. "The post-release-control statute required a court to impose the terms of post-release control and left it to the Adult Parole Authority (APA) to determine whether to impose sanctions for any violation of the terms. The Court said that this statute was 'clearly distinguishable' from the bad-time statute at issue in *Bray*." *Id.* at ¶ 22, quoting *Woods* at 512. "Unlike additional prison time under the latter statute, post-release-control terms were made part of the original judicially imposed sentence." *Ferguson* at ¶ 22. "'[B]ecause the APA's discretion in managing post-release control does not impede the function of the judicial branch,' said the Court, the post-release-control statute did not violate the separation-of-powers doctrine." *Id.* at ¶ 22, quoting *Woods* at 512.

{¶54} The Second District in *Ferguson* determined that the Reagan Tokes Law does not violate separation of powers, noting that the Ohio Supreme Court had "made it clear that, when the power to sanction is delegated to the executive branch, a separation-of-powers problem is avoided if the sanction is originally imposed by a court and included in its sentence." *Ferguson* at ¶ 23, citing *Hernandez v. Kelly*, 108 Ohio St.3d 395, 2006-Ohio-126, 844 N.E.2d 301, ¶ 18-20, citing *State v. Jordan*, 104 Ohio St.3d 21, 2004-Ohio-6085, 817 N.E.2d 864, ¶ 19, *overruled on other grounds*, citing *Woods*. "Such is the case under the scheme established by the Reagan Tokes Law." *Ferguson* at ¶ 23. The *Ferguson* court explained that pursuant to the Reagan Tokes Law:

18

A court imposes both the minimum and maximum prison terms, including both in its sentence. The [ODRC] then determines whether the offender merits more than the minimum and up to the maximum imposed. In terms of the separation of powers, the delegation of power to the [ODRC] is like the system of post-release control: "Those terms are part of the actual sentence, unlike bad time, where a crime committed while incarcerated resulted in an additional sentence not imposed by the court. In other words, the court imposes the full sentence and the [ODRC] determines whether violations merited its imposition."

*Id.* at ¶ 23, quoting *Woods* at 511.

{¶55} Accordingly, appellate courts considering this challenge to the Reagan Tokes Law have concluded that the law does not violate the separation of powers doctrine. *Ferguson* at ¶ 23 (2d Dist.); *Hacker*, 2020-Ohio-5048, at ¶ 22-23 (3d Dist.); *State v. Alexander*, 4th Dist. Adams No. 21CA1144, 2022-Ohio-1812, ¶ 56; *Ratliff*, 2022-Ohio-1372, at ¶ 56 (5th Dist.); *Maddox*, 2022-Ohio-1350, at ¶ 7 (6th Dist.); *Delvallie*, 2022-Ohio-470, at ¶ 34 (8th Dist.); *State v. Henderson*, 12th Dist. Warren No. CA2020-11-072, 2021-Ohio-3564, ¶ 10-12. We agree.

{¶56} Appellant's challenge to the Reagan Tokes Law under the separation of powers doctrine is without merit.

D. Due Process of Law

*1. Introduction*

{¶57} The next question before us is whether the Reagan Tokes Law violates due process by failing to provide adequate protections for inmates during the process by which the ODRC determines whether it should maintain an inmate in confinement after the expiration of the minimum prison term. This is a facial challenge to the constitutionality of the enactment, thereby placing the burden on appellant to prove beyond a reasonable

19

doubt that there is no set of circumstances under which the Reagan Tokes Law would be constitutional.

**{¶58}** "The touchstone of due process is protection of the individual against arbitrary action of government." (Citation omitted.) *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

**{¶59}** The Due Process Clause in the Fourteenth Amendment to the United States Constitution provides: "No State shall * * * deprive any person of life, liberty, or property, without due process of law * * *." The Due Course of Law Clause in Article I, Section 16 of the Ohio Constitution provides: "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay." The two clauses are coextensive and provide equivalent due process protections. *State v. Aalim*, 150 Ohio St.3d 489, 2017-Ohio-2956, 83 N.E.3d 883, ¶ 15; *State v. Anderson*, 148 Ohio St.3d 74, 2016-Ohio-5791, 68 N.E.3d 790, ¶ 21. We can therefore rely on decisions of both the United States Supreme Court and the Ohio Supreme Court. *Anderson* at ¶ 23.

**{¶60}** The standard analysis of due process proceeds in two steps: "We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219, 131 S.Ct. 859, 178 L.Ed.2d 732 (2011), citing *Kentucky Dept. of Corr. v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). In other words, "[o]nce it is determined that due process applies, the question remains what process is due. * * * [N]ot all situations calling for procedural safeguards call for the same kind of procedure." *Morrissey v. Brewer*, 408 U.S. 471, 481,

20

92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). At a minimum, "[o]ur courts have long recognized that due process requires both notice and an opportunity to be heard." *In re Thompkins*, 115 Ohio St.3d 409, 2007-Ohio-5238, 875 N.E.2d 582, ¶ 13.

### 2. The Liberty Interest

{¶61} Those who seek to invoke the procedural protection of the Due Process Clause must establish that one of three interests is at stake: life, liberty, or property. *Wilkinson v. Austin*, 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005). A "liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,'" or "from an expectation or interest created by state laws or policies." (Citations omitted.) *Id.*

{¶62} At stake here is an inmate's liberty interest. "[L]awfully incarcerated persons retain only a narrow range of protected liberty interests." *Hewitt v. Helms*, 459 U.S. 460, 467, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). "There is no constitutional or inherent right of a convicted person to be conditionally released [e.g., released on parole] before the expiration of a valid sentence." *Greenholtz v. Inmates of the Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). "However, if *state law* entitles an inmate to release on parole, that entitlement is a liberty interest that is not to be taken away without due process." (Emphasis added.) *Ratliff*, 2022-Ohio-1372, at ¶ 20, citing *Greenholtz* at 11-16 ("where the [United States] Supreme Court so held in the context of a statute providing that the Nebraska parole board 'shall' release parole-eligible inmates unless one of several factors specified in the statute should be found to exist").

{¶63} With this in mind, the relevant sections of the Reagan Tokes Law provide as follows:

21

Case No. 2021-P-0052

(B) When an offender is sentenced to a non-life felony indefinite prison term, there shall be *a presumption that the person shall be released from service of the sentence on the expiration of the offender's minimum prison term or on the offender's presumptive earned early release date, whichever is earlier.*

(C) The presumption established under division (B) of this section is a *rebuttable presumption that the department of rehabilitation and correction may rebut as provided in this division. Unless the department rebuts the presumption, the offender shall be released* from service of the sentence on the expiration of the offender's minimum prison term or on the offender's presumptive earned early release date, whichever is earlier. *The department may rebut the presumption only if the department determines, at a hearing, that one or more of the following applies*:

(1) Regardless of the security level in which the offender is classified at the time of the hearing, both of the following apply:

(a) During the offender's incarceration, the offender committed institutional rule infractions that involved compromising the security of a state correctional institution, compromising the safety of the staff of a state correctional institution or its inmates, or physical harm or the threat of physical harm to the staff of a state correctional institution or its inmates, or committed a violation of law that was not prosecuted, and the infractions or violations demonstrate that the offender has not been rehabilitated.

(b) The offender's behavior while incarcerated, including, but not limited to the infractions and violations specified in division (C)(1)(a) of this section, demonstrate that the offender continues to pose a threat to society.

(2) Regardless of the security level in which the offender is classified at the time of the hearing, the offender has been placed by the department in

22

extended restrictive housing at any time within the year preceding the date of the hearing.

(3) At the time of the hearing, the offender is classified by the department as a security level three, four, or five, or at a higher security level.

(Emphasis added.)  R.C. 2967.271.

{¶64}  "The legislature by choosing the language 'there shall be a presumption that the person *shall be released*' and 'Unless the department rebuts the presumption, the offender *shall be released*,' within the Reagan Tokes Law has arguably created enforceable liberty interests in parole*."  Ratliff* at ¶ 30, citing *Board of Pardons v. Allen*, 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987) (where the United States Supreme Court so held in the context of a Montana statute providing that the parole board "shall" release a prisoner, subject to certain restrictions).  *See also State ex rel. Bailey v. Ohio Parole Bd.*, 152 Ohio St.3d 426, 2017-Ohio-9202, 97 N.E.3d 433, ¶ 10 ("The Revised Code creates an inherent expectation 'that a criminal offender will receive *meaningful* consideration for parole.'" (Citation omitted; emphasis sic.)); and *Inmates of Orient Corr. Inst. v. Ohio State Adult Parole Auth.*, 929 F.2d 233, 236-237 (6th Cir.1991) (where the court suggested that a protected liberty interest would be created by regulations alone if they "created an explicit presumption of entitlement to release on parole" or "otherwise used 'mandatory language' in connection with 'specific substantive predicates' for release on parole").

{¶65}  A liberty interest is always at stake when an inmate is entitled to release from confinement, whether that entitlement is presumptive or otherwise.  And there is no disagreement that some liberty interest arises from an expectation or interest that is

23

Case No. 2021-P-0052

created by the Reagan Tokes Law. *See Eaton*, 2022-Ohio-2432, at ¶ 127 ("The courts that have considered similar due process challenges to the Reagan Tokes Law have had no difficulty in concluding that defendants do, in fact, have a liberty interest sufficient to trigger due process safeguards."). Nevertheless, the exact nature of this liberty interest—and, by extension, the nature of the process due—has been the subject of much debate within and amongst our sibling courts. This disagreement is discussed further below, pertaining to the procedural safeguards of the additional term hearing. But first, we consider notice.

### 3. Notice of Proscribed Conduct

{¶66} "In the criminal context, the requirement of notice concerns 'the accused's right to fair notice of the proscribed conduct.'" *State v. Philpotts*, 2019-Ohio-2911, 132 N.E.3d 743, ¶ 44 (8th Dist.), quoting *State v. Wheatley*, 2018-Ohio-464, 94 N.E.3d 578, ¶ 33 (4th Dist.), citing *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). "This refers to the principle that due process requires criminal statutes to be written clearly so that individuals are provided with a fair warning that a certain conduct is within the statute's prohibition." *Philpotts* at ¶ 44, citing *Wheatley* at ¶ 33, citing *Screws v. United States*, 325 U.S. 91, 103-104, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); *Connally* at 391 ("a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law"); and *State v. Elmore*, 122 Ohio St.3d 472, 2009-Ohio-3478, 912 N.E.2d 582, ¶ 23 (due process requires law to be written so that the public can adequately inform itself before acting).

24

{¶67} Again, in order to rebut the presumptive release date, the ODRC is required to conduct a hearing and make at least one of the following statutory findings before it may maintain the inmate beyond the presumptive release date:

> (1) Regardless of the security level in which the offender is classified at the time of the hearing, both of the following apply:
>
>> (a) During the offender's incarceration, the offender committed *institutional rule infractions* that involved compromising the security of a state correctional institution, compromising the safety of the staff of a state correctional institution or its inmates, or physical harm or the threat of physical harm to the staff of a state correctional institution or its inmates, or committed a *violation of law* that was not prosecuted, and the infractions or violations demonstrate that the offender *has not been rehabilitated.*
>>
>> (b) *The offender's behavior* while incarcerated, including, but not limited to the infractions and violations specified in division (C)(1)(a) of this section, demonstrate that the offender *continues to pose a threat to society.*
>
> (2) Regardless of the security level in which the offender is classified at the time of the hearing, the offender has been *placed by the department in extended restrictive housing* at any time within the year preceding the date of the hearing.
>
> (3) At the time of the hearing, the offender is classified by the department as a *security level three, four, or five, or at a higher security level.*

(Emphasis added.) R.C. 2967.271(C).

{¶68} The inmate rules of conduct are set forth in Ohio Adm.Code 5120-9-06. The disciplinary procedures for violations of inmate rules of conduct before the rules infraction board are set forth in Ohio Adm.Code 5120-9-08. The procedures for when and why an inmate may be placed in a restrictive housing assignment are set forth in Ohio Adm.Code.

25

Case No. 2021-P-0052

5120-9-10. The hearing procedure for release consideration is set forth in Ohio Adm.Code 5120:1-1-11. *See also Ratliff*, 2022-Ohio-1372, at ¶ 47. Each of these Ohio Administrative Code procedures provides, at a minimum, notice and an opportunity to be heard. *See also id.* at ¶ 48.

{¶69} Accordingly, we conclude that an inmate is provided with advance notice under the Revised Code and the Ohio Administrative Code of the behavior and conduct that may contribute to or could result in the ODRC rebutting the presumption of release.

### 4. Procedural Safeguards

{¶70} "Although the concept is flexible, at its core, procedural due process under both the Ohio and United States Constitutions requires, at a minimum, an opportunity to be heard when the state seeks to infringe a protected liberty or property right." (Footnote omitted.) *State v. Cowan*, 103 Ohio St.3d 144, 2004-Ohio-4777, 814 N.E.2d 846, ¶ 8, citing *Biddie v. Connecticut*, 401 U.S. 371, 377, 91 S.Ct. 780, 28 L.E.2d 113 (1971). "[T]he opportunity to be heard must occur at a meaningful time and in a meaningful manner." (Citations omitted.) *Cowan* at ¶ 8*; see also Vitek v. Jones*, 445 U.S. 480, 500, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (Powell, J., concurring) ("The essence of procedural due process is a fair hearing.").

{¶71} As stated above, our sibling districts are at odds regarding the extent of the liberty interest and the process that safeguards a fair hearing. The disagreement is rooted in whether the rebuttable presumption of release in the Reagan Tokes Law is most analogous to parole revocation proceedings or parole release proceedings (alternatively referred to as parole eligibility proceedings).

26

{¶72} "The distinction between parole eligibility and parole revocation is significant when discussing due process because the liberty interest in parole revocation – which entails taking someone's freedom away – is much greater than the liberty interest in parole eligibility – which typically entails the hope or anticipation of freedom." *Delvallie*, 2022-Ohio-470, at ¶ 139 (Forbes, J., dissenting), citing *Greenholtz*, 442 U.S. at 9 ("[P]arole *release* and parole *revocation* are quite different. There is a crucial distinction between being deprived of a liberty one has, as in parole [revocation], and being denied a conditional liberty that one desires[,]" as in parole release or eligibility (Emphasis sic.)). Although neither affords an inmate the "full panoply of rights due" in a criminal prosecution, *Morrissey*, 408 U.S. at 480, parole revocation requires greater procedural safeguards than parole eligibility or parole release. *Greenholtz* at 10.

{¶73} The Sixth and Twelfth Districts have concluded that the additional term hearings under the Reagan Tokes Law are more analogous to parole revocation proceedings. *State v. Stenson*, 2022-Ohio-2072, 190 N.E.3d 1240, ¶ 31 (6th Dist.) ("the Reagan Tokes Law creates a liberty interest more akin to probation revocation decisions"); *Guyton,* 2020-Ohio-3837, at ¶ 17 ("[t]he hearings conducted by the ODRC under R.C. 2967.271(C) are analogous to parole revocation proceedings, probation revocation proceedings, and postrelease control violation hearings"). The Twelfth District explains this conclusion merely by stating that "[t]his is because * * * all three situations concern whether a convicted felon has committed violations while under the control and supervision of the ODRC." *Guyton* at ¶ 17. The Sixth District undertakes a more thorough analysis, explaining that "the Reagan Tokes Law functions unlike the merely discretionary decision to release an offender on parole," which is largely "'subjective' and 'predictive.'"

27

*Stenson* at ¶ 28-30, quoting *Greenholtz* at 13. Rather, the Sixth District finds that the additional term hearing of the Reagan Tokes Law functions more like a parole revocation decision by requiring "two determinations under R.C. 2967.271(C)(1): (1) did the offender, during his incarceration, commit certain rule violations or unprosecuted crimes?—'wholly retrospective factual question[s]'; and (2) does this behavior demonstrate that the offender still poses a threat to society?" *Stenson* at ¶ 30, quoting *Greenholtz* at 8. This conclusion is also expressly favored by the five dissenting judges in the Eighth District's en banc opinion. *See Delvallie* at ¶ 140-142 (Forbes, J., et al., dissenting) ("Unlike Ohio's parole eligibility proceedings, the Reagan Tokes Law includes an express presumption of release[.]") and ¶ 192 (Mays, J., et al., dissenting in part).

{¶74} Under this parole revocation view, the process that is due with regard to the additional term hearing under the Reagan Tokes Law is set forth in the United States Supreme Court's decision in *Morrissey*. *See Stenson* at ¶ 31; *Guyton* at ¶ 14; and *Delvallie* at ¶ 148 (Forbes, J., dissenting). Pursuant to *Morrissey*, the minimum requirements of due process include the following for parole revocation proceedings:

> (a) written notice of the claimed violations of parole;
>
> (b) disclosure to the parolee of evidence against him;
>
> (c) opportunity to be heard in person and to present witnesses and documentary evidence;
>
> (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation);
>
> (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and

28

(f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.

*Morrissey* at 489; *accord State v. Miller*, 42 Ohio St.2d 102, 104, 326 N.E.2d 259 (1975).

{¶75} On the other hand, the Second District has concluded that "requiring a defendant to remain in prison beyond the presumptive minimum term is akin to the decision to grant or deny parole," i.e., akin to parole eligibility/release, rather than parole revocation. *State v. Leet,* 2d Dist. Montgomery No. 28670, 2020-Ohio-4592, ¶ 17. "Simply put, if [the offender] commits rule infractions or crimes while in prison, he may be required to serve the entire sentence already imposed by the trial court." *Id.* This conclusion, that the liberty interest at stake under the Reagan Tokes Law is most analogous to parole eligibility/release, is also favored by the Sixth District's lead opinion in *Eaton*, albeit the minority view of that panel's decision. *Eaton*, 2022-Ohio-2432, at ¶ 133. The author of that opinion provides several reasons in support of this conclusion:

> First, the defendant is suffering a loss of his physical liberty in institutional confinement in both situations [the initial parole release hearing and the additional term hearing under the Reagan Tokes Law], unlike the relative freedom he enjoys when already released on parole or post-release control. This is important because a defendant who is already in confinement has a reduced liberty interest and is therefore entitled to less process than a defendant who is already free.

> Second, in both the parole release hearing and the [additional term] review hearing under the Reagan Tokes Law, the reviewing body is focused upon whether the defendant's conduct justifies his *release* from confinement, not whether he should be *returned* to confinement. Again, the liberty interests are different and thus the protections to which a defendant is entitled are different.

> Since the trial court imposes *both* the minimum and maximum sentence, a defendant sentenced under the Reagan Tokes Law is still serving his sentence at the time of the additional

29

term hearing and, if ordered to serve the indefinite portion of the sentence, will continue to serve the sentence previously imposed by the trial court. Therefore, the issue in the additional term hearing is release from confinement, not revocation of parole. Stripping away the semantics, the reality here is that, from [the inmate's] perspective, he is presently incarcerated and wishes to be freed from incarceration – by definition, this is release and not revocation.

(Emphasis sic.) *Id.* at ¶ 131-132. Further support for this view can be found in the fact that R.C. 2967.271 is referenced in R.C. 2967.13, the statute governing "parole eligibility" ("(F) A prisoner serving a stated prison term that is a non-life felony indefinite prison term shall be released in accordance with sections 2967.271 and 2967.28 of the Revised Code."); *compare* R.C. 2967.15 (the statute governing parole revocation makes no mention of R.C. 2967.271).

{¶76} Under this parole eligibility/release view, the process that is due with regard to the additional term hearing under the Reagan Tokes Law is equivalent to "the process required for defendants under the presumptive parole regime"—i.e., "minimal process including an opportunity to be heard and an explanation of the basis for denial of parole release." *Eaton* at ¶ 137, citing *Greenholtz*, 442 U.S. at 16 ("The Constitution does not require more."); *Swarthout*, 562 U.S. at 220 ("In the context of parole, we have held that the procedures required are minimal."); *see also Bailey*, 2017-Ohio-9202, at ¶ 9-10.

{¶77} We find it premature to reach a conclusion on this issue. Again, "[a] facial challenge to a statute is the most difficult to bring successfully because the challenger must establish that there exists no set of circumstances under which the statute would be valid." *Harrold*, 2005-Ohio-5334, at ¶ 37, citing *Salerno*, 481 U.S. at 745. To prevail, it must be shown that the statute cannot be constitutionally applied in *any* circumstances.

30

*Wymslo v. Bartec, Inc.*, 132 Ohio St.3d 167, 2012-Ohio-2187, 970 N.E.2d 898, ¶ 21. "The fact that a statute might operate unconstitutionally under some plausible set of circumstances is insufficient to render it wholly invalid." *Harrold* at ¶ 37, citing *Salerno* at 745. Additionally, we caution that "[t]he judicial authority to override the legislative will should be used with extreme caution and restraint, because declaring a statute unconstitutional based on a facial challenge is an 'exceptional remedy.'" *State v. Mole*, 149 Ohio St.3d 215, 2016-Ohio-5124, 74 N.E.3d 368, ¶ 96 (Kennedy, J., dissenting), quoting *Carey v. Wolnitzek,* 614 F.3d 189, 201 (6th Cir.2010); *see also Sabri v. United States*, 541 U.S. 600, 609, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004), quoting *United States v. Raines*, 362 U.S. 17, 22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960) ("Facial adjudication carries too much promise of 'premature interpretation of statutes' on the basis of factually barebones records.").

**{¶78}** Here, because the ODRC has not sought to extend appellant's term beyond the presumptive minimum sentence, appellant's challenge is necessarily a facial challenge to the Reagan Tokes Law. *See Stenson*, 2022-Ohio-2072, at ¶ 31; *see also Delvallie*, 2022-Ohio-470, at ¶ 53, citing *Morrissey*, 408 U.S. at 480 (an inmate's liberty interest in the right to be released from a prison term "does not arise until after the offender is sentenced and his conviction deemed final").

**{¶79}** As noted by the Sixth and Eighth Districts, the United States Supreme Court's opinion in "*Morrissey* is instructive because it necessarily implies that the specific procedural requirements applicable to protect a particular liberty interest need not be set forth in the legislation itself." *Stenson* at ¶ 32, citing *Morrissey*; *Delvallie* at ¶ 66 ("*Morrissey* itself does not even require the legislature to codify the procedural details,

31

nor does it require the executive agency to formally draft rules in compliance with *Morrissey*."). We agree. Albeit in the specific context of the process due a parolee whose parole is being revoked, the Court acknowledged that most states have enacted legislation setting forth procedural requirements for parole revocation hearings, while others have done so by judicial decision. *Morrissey* at 488 ("We cannot write a code of procedure; that is the responsibility of each State. Most States have done so by legislation, others by judicial decision usually on due process grounds."). "In other words, *Morrissey* suggests that the Reagan Tokes Law may not be found to be unconstitutional, on its face, as violating due process merely because the specific procedures for invoking an additional period of incarceration are not set forth in the Law itself." *Stenson* at ¶ 32.

{¶80} "No constitutional provision requires the legislature to expressly set forth each and every right afforded to an offender at every stage of proceedings created by statutory process. For that, the legislature is free to delegate authority to the executive branch." *Delvallie* at ¶ 58, citing *AMOCO v. Petroleum Underground Storage Tank Release Comp. Bd.*, 89 Ohio St.3d 477, 480, 733 N.E.2d 592 (2000) (the General Assembly may delegate rule-making authority to an executive agency); *State v. Schreckengost*, 30 Ohio St.2d 30, 32, 282 N.E.2d 50 (1972) ("Delegation to state administrative officials of the authority to adopt and enforce regulations to implement such a declared legislative policy is not, per se, unlawful."); and *O'Neal v. State*, 2020-Ohio-506, 146 N.E.3d 605, ¶ 50 (10th Dist.) ("the General Assembly constitutionally may delegate authority to promulgate rules, policies, and regulations to subordinate boards and agencies"). "[T]he legislature is not required to codify all rules and procedures under the statutory provision but instead can defer to the executive agency's establishment of

32

its own rules or procedures to safeguard constitutional concerns, which must be challenged through the appropriate mechanisms." *Delvallie* at ¶ 59, citing *Wilkinson*, 545 U.S. at 226 and *Wolff*, 418 U.S. at 563 (both cases involved reviewing the rules or procedures established by the executive agency for constitutional compliance).

**{¶81}** R.C. 2967.271 does not include procedural requirements for the additional term hearing, nor does it include language authorizing the ODRC to draft rules and regulations for the review hearings. Nevertheless, the enabling statute R.C. 5120.01 requires that "[a]ll duties" conferred upon the ODRC by the legislature "shall be performed under the rules and regulations that the director prescribes and shall be under the director's control." *See Delvallie*, 2022-Ohio-470, at ¶ 60, quoting *Bibler v. Stevenson*, 150 Ohio St.3d 144, 2016-Ohio-8449, 80 N.E.3d 424, ¶ 15 ("R.C. 2967.271 'does not exist in a vacuum. It is a creature of the Revised Code, it is subservient to the Revised Code, and it necessarily incorporates the Revised Code.'").

**{¶82}** Expressly under the authority of R.C. 5120.01 and R.C. 2967.271, the Director of the ODRC promulgated ODRC Policy 105-PBD-15, available at https://drc.ohio.gov/policies/parole-board (last visited July 25, 2022). "The purpose of this policy is to establish a standard procedure for the [ODRC] to carry out its statutory duties efficiently and consistently concerning the Additional Term Hearing Process for persons sentenced under Senate Bill 201 (132nd Ohio General Assembly)." ODRC Policy 105-PBD-15, Section II. The Policy itself is set forth as follows:

> Pursuant to the authority granted to ODRC under ORC 2967.271, it is the policy of ODRC to establish an Additional Term Hearing process for conducting hearings to determine whether the presumption of release at the expiration of an incarcerated adult's minimum term is rebutted, and if so, to

33

maintain incarceration of an incarcerated adult for an additional period of time, up to the maximum term. Incarcerated adults sentenced under ORC 2967.271 may be subject to an Additional Term Hearing following a finding of guilt of certain Inmate Rules of Conduct by the Rules Infraction Board (RIB) and affirmance of that finding after completion of any RIB appeals or following a recommendation from the Annual Security Review Team.

ODRC Policy 15-PBD-15, Section V.

{¶83} Two issues arise: (1) whether the policy is of sufficient legal force and effect to fill the legislative procedural gaps left by R.C. 2971.271; and (2) whether the policy provides constitutionally sufficient due process. *See, e.g., Delvallie* (where the issues are debated at length in the en banc and dissenting opinions). These issues, however, should be addressed in an as-applied challenge to the procedural safeguards in effect at the time, if ever, appellant is subjected to an additional term hearing. *But see Eaton*, 2022-Ohio-2432, at ¶ 141 (addressing the substance and constitutional sufficiency of the administrative policy). "This cannot be overemphasized. The appropriate mechanism to challenge the validity of policies, rules, regulations, or protocols established by the executive is through a separate declaratory judgment or habeas action seeking to preclude ODRC from enforcing them, which only occurs at the actual time when those policies, rules, regulations, or protocols are being applied against the inmate." (Citations omitted.) *Delvallie* at ¶ 91.

{¶84} "[G]iven that this is a facial challenge to the Law, it cannot be said at this juncture that the Law 'cannot be applied constitutionally in any circumstances.' Should the Law ultimately be applied in a manner that is unconstitutional, an offender would not be precluded from challenging the Law as applied." *Stenson*, 2022-Ohio-2072 at ¶ 33,

34

citing *Wilkinson*, 545 U.S. at 230 ("If an inmate were to demonstrate that the New Policy did not in practice operate in [a constitutionally-permissible] fashion, resulting in a cognizable injury, that could be the subject of an appropriate future challenge."); *see also Delvallie*, 2022-Ohio-470, at ¶ 90 ("If the sentence, as imposed, is valid at this stage, an inmate has the later right to challenge the actual process or procedures that particular inmate will be subjected to when the sentence is actually carried out by the executive branch.").

{¶85} Appellant's arguments pertaining to the procedural safeguards of the additional term hearing are as-applied challenges and not ripe for review. Accordingly, we conclude that the Reagan Tokes Law does not, on its face, violate the constitutional right to due process.

### 5. Court Hearing

{¶86} Finally, the argument that the Reagan Tokes Law violates an inmate's right to due process because it fails to provide a court hearing prior to imposing prison time beyond the minimum term has been found without merit by the Second, Fourth, and Twelfth District Courts of Appeal, and we agree with their conclusion. Even under *Morrissey*'s heightened standard of minimum due process pertaining to parole revocation, it is not required that the sentencing court conduct the proceedings. *See Guyton*, 2020-Ohio-3837, at ¶ 16-17, citing *Woods*, 89 Ohio St.3d 504 (*Morrissey* requires no more than a hearing conducted by a neutral and detached Parole Board hearing officer); *accord Alexander*, 2022-Ohio-1812, at ¶ 60; *see also Barnes*, 2020-Ohio-4150, at ¶ 38, fn. 2.

{¶87} For these reasons, we conclude that the Reagan Tokes Law does not, on its face, violate the constitutional right to due process.

35

**{¶88}** Appellant's fifth assigned error is without merit.

## V.     Conclusion

**{¶89}** The judgment of the Portage County Court of Common Pleas is affirmed.


MARY JANE TRAPP, J.,

MATT LYNCH, J.,

concur.

Case No. 2021-P-0052